RUTH F. DIXON, COMPLAINANT, v. RUTGERS, THE STATE UNIVERSITY OF NEW JERSEY; EDWARD J. BLOUSTEIN, PRESIDENT; RUSSELL N. FAIRBANKS, PROVOST; WALTER K. GORDON, DEAN, RESPONDENTS–APPELLANTS.

Argued January 20, 1988—Decided May 25, 1988.

*Aron M. Schwartz* argued the cause for appellants (*Vogel, Chait, Schwartz & Collins,* attorneys).

*Susan L. Reisner,* Deputy Attorney General, argued the cause for Division on Civil Rights (*W. Cary Edwards,* Attorney General of New Jersey, attorney, *James J. Ciancia,* and *Andrea M. Silkowitz,* Assistant Attorneys General, of counsel).

*Alexander P. Waugh, Jr.,* argued the cause for *amicus curiae* The Trustees of Princeton University (*Smith, Stratton, Wise, Heher & Brennan,* attorneys; *Alexander P. Waugh, Jr.,*

*William J. Brennan, III* and *Thomas H. Wright, Jr.,* of counsel; *Alexander P. Waugh, Jr.* and *Thomas H. Wright, Jr.,* on the brief).

*Denise Reinhardt* submitted a brief on behalf of *amicus curiae* Rutgers Council of AAUP Chapters (*Reinhardt & Schachter,* attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal concerns the interest of a university in maintaining the confidentiality of peer review materials used in its tenure and promotion decisions, and a faculty member's competing interest in obtaining such materials to establish a *prima facie* claim of unlawful sex discrimination under the Law Against Discrimination (LAD), *N.J.S.A.* 10:5-1 to -42. We reject the University's request to create a qualified privilege to protect the confidentiality of academic peer review materials. While we hold that the requested peer review materials are discoverable in the context of an anti-discrimination suit, we instruct trial courts to issue appropriate protective orders to ensure that discovery of the confidential materials is not unnecessarily broad and that access to such materials is limited. We likewise reject the contention that the collective bargaining agreement between Rutgers and the American Association of University Professors (AAUP)[1] precludes discovery of the peer review materials. We thus affirm the judgment of the Appellate Division as modified. *Dixon v. Rutgers Univ.,* 215 *N.J.Super.* 333 (1987).

## I.

In 1971 Rutgers hired Dr. Ruth Dixon, a black female, as Assistant Professor and Chairperson of the Educational Oppor-

---

[1]The Trustees of Princeton University and the Rutgers Council of the American Association of University Professors (AAUP) have participated as *amici curiae* in this appeal.

tunity Fund Instructional Department, later known as the Academic Foundations Department, at Rutgers' Camden College of Arts and Sciences (Camden College).  In August 1976 Rutgers notified Dixon that she would be evaluated for tenure and promotion to Associate Professor during the 1976–1977 academic year.  If Dixon were denied tenure, university regulations provided that she would receive a one-year terminal contract as a lecturer.  Pursuant to university procedures, Dixon was first evaluated by an *ad hoc* faculty committee, and then by the Appointments and Promotions Committee, and by the Dean of Camden College.  These three evaluators unanimously recommended that Dixon be granted tenure and promotion. Dixon's promotion packet was then forwarded to the university-wide Promotion Review Committee (PRC).  The PRC, appointed by the University president, reviews all evidence previously considered in connection with a proposed promotion and granting of tenure, including the confidential letters of recommendation from sources outside the University, and then submits its recommendations to the president.  In February 1977 the PRC declined to recommend Dixon for promotion and tenure because of "insufficient evidence of distinction in teaching, creativity and research."

In April 1977 the Dean of Camden College informed Dixon that she would not receive tenure and promotion, and offered her a terminal contract as a lecturer.  Eight days later Dixon filed a complaint with the Division of Civil Rights (DCR), alleging discrimination in the tenure and promotion process based on her race and sex contrary to the LAD.  Dixon also availed herself of the University's internal grievance procedures.  During this grievance process two neutral readers are appointed to review the confidential outside letters.  Although the Rutgers–AAUP agreement expressly provides that "[t]he confidentiality of the contents and identity of the writers shall be protected at all times," the AAUP states that after this review "the contents of the outside letters are disclosed, in paraphrase and in substance, to unsuccessful candidates in the

grievance procedures." The record on hand provides no further detail on the extent of this disclosure.

The University's own Grievance Review Committee ordered the PRC to reconsider its initial recommendation based on a finding that the teaching effectiveness category used in the evaluation was inapplicable to Dixon. After reconsideration the PRC again recommended against promotion and tenure. This time the PRC reasoned that Dixon could not be recommended for promotion and tenure because her record reflected "insufficient evidence of research and scholarly activities expected of a faculty member in [the] Academic Foundations [department]." Four months later, however, the Board of Governors of the University decided to award tenure to Dixon, retroactive to July 1, 1977. The record before us does not contain any explanation for this reversal by the Board of Governors. The Board of Governors did not, however, reverse that portion of the PRC's recommendation that denied Dixon promotion to the position of Associate Professor.

Dixon's major allegation in her complaint was that she received "disparate treatment" in that she was treated less favorably than two men, Assistant Professors William Jones and Henry Eng, who were granted tenure by Rutgers at approximately the same time the University denied her tenure and promotion. Unlike Dixon, who had no teaching responsibilities due to her role as Department Chairperson, both of these men were primarily teachers—Jones in English and Eng in mathematics. Nevertheless, all three were chairpersons of the Academic Foundations Department of their respective campuses. The PRC examined the promotion and tenure records of Jones and Eng the day before that committee reviewed Dixon's record. However, the PRC gave the men favorable recommendations. The PRC recommended that Eng, an Assistant Professor at Livingston, be given tenure, and that Jones, an Assistant Professor at Newark, be given both tenure and a promotion to the rank of Associate Professor. Rutgers' Board of Governors

later adopted the PRC's recommendations concerning Jones and Eng.

As part of its investigation into Dixon's allegations of discrimination, the DCR served interrogatories on the University. In response to those interrogatories, the University supplied the DCR with the promotion packets of Jones, Eng, and Dixon. Those promotion packets contain all the materials that were before the PRC when it made its promotion and tenure decisions. The packets include the personnel file of each candidate, recommendations of each of the peer review committees, materials submitted by each candidate in support of his or her application for promotion and tenure, as well as confidential letters evaluating the candidate submitted by individuals outside the University at the latter's request. Rutgers agreed to release the packets of Jones and Eng to the DCR provided that they be used exclusively by DCR personnel involved in the investigation. In a letter to Rutgers' counsel, the DCR assured the University that access to the packets would be limited to DCR personnel, but added that "should a public hearing be ordered in this matter the information may be entered into evidence."

On September 28, 1982, almost five years after the complaint was first filed, the DCR issued a Finding of Probable Cause to credit Dixon's allegation of sex discrimination in the original tenure and promotion decisions. At the same time, the DCR did not find probable cause to credit the allegation of unlawful discrimination based on race since both Jones and Eng were members of racial minorities. The DCR's sex discrimination finding was based on its conclusion that Dixon received "substantially different [treatment] than her male counterparts ... markedly reflected in ... promotion and tenure policies." As expressed in the DCR's Finding of Probable Cause, the DCR reached this conclusion because it found that the two men had demonstrably inferior credentials in comparison to Dixon:

At the time Complainant initially applied for promotion with tenure she had nearly completed the requirements of her doctoral degree and had also produc-

ed at least one document for publication. Regardless of these credentials she was denied both promotion and tenure.

In comparison, William Jones, a black male, possessing only a M.A. degree, and never having produced any documents for publication was granted promotion with tenure. Henry Eng, an oriental male, possessing only a B.A. degree, who also had not produced any documents for publication, was granted promotion with tenure. In both comparisons the males were unconditionally granted professional advancements while ... [Dixon] was denied these same privileges.

Following the DCR's Finding of Probable Cause to credit the allegations of sex discrimination, the Dixon matter was transferred to the Office of Administrative Law. Pursuant to a pretrial order, Rutgers moved before the Administrative Law Judge (ALJ) to strike and suppress from evidence various confidential documents, including the promotion packets of Jones and Eng and the confidential letters of the outside evaluators in Dixon's packet. The University argued that (1) the documents were subject to an applicable qualified privilege; and (2) the express provisions of the relevant collectively negotiated agreements between Rutgers and its branch of the AAUP mandated strict confidentiality of the documents in question.

In support of its motion to suppress the peer review materials, Rutgers argued that the promotion packets of Jones and Eng were not relevant since University tenure and promotion policies operated on a noncomparative basis. As support for this position Rutgers submitted the affidavit of Susan A. Cole, Rutgers' Vice President for University Administration and Personnel:

Candidates for promotion are not compared to other candidates for promotion during the evaluation process. Rather, they are judged by the levels of achievement and accomplishment expected by colleagues in the field at Rutgers University and elsewhere; *i.e.*, they are evaluated by institutional and national peers in accordance with standards of accomplishment appropriate to their discipline and rank. Thus, to justify an award of promotion with tenure, candidates must have a sufficiently distinguished record of achievement appropriate to the particular rank as defined by their institutional and national peers in their discipline. There is no competition among candidates for promotion and tenure. Nor is there a limited number of tenure positions or promotion opportunities available for which the candidates compete.

The DCR contested this statement with the affidavit of a DCR field investigator who certified that one PRC member had admitted to him that on at least one occasion during its deliberations the committee had compared Jones to Dixon. In addition, another PRC member told the field investigator that "you cannot stop one from comparing people in the same department."

On March 6, 1986, the ALJ denied the University's motion to suppress the promotion packets. The ALJ held that the files would be relevant at the time of hearing in order for Dixon to establish a *prima facie* case of unlawful discrimination on account of sex "by demonstrating differential treatment between males and females without legitimate reason." In denying the University's motion to exclude the files from evidence, the ALJ did, however, allow the striking of the outside authors' names "so long as Rutgers did not place greater weight on one outside specialist over another because of reputation in the academic community."

Rutgers filed a petition for interlocutory review of the ALJ's decision with the Director of the DCR. Once that petition was denied, the University moved before the Appellate Division for interlocutory review of the ALJ's order. The Appellate Division granted the motion, and affirmed the ALJ's order. *Dixon v. Rutgers Univ., supra,* 215 *N.J.Super.* 333.

The Appellate Division held that the public interest in eradicating unlawful discrimination, which the court said "has always been of predominant concern in our State," outweighed the public interest served by maintaining the confidentiality of the promotion packets of Rutgers' faculty. *Id.* at 339. The court ruled that the files in question were relevant and "seemingly ... essential to a [comparative] determination as to whether disparate treatment was rendered." *Id.* at 339–40. It also "perceive[d] no merit in Rutgers' contention that differences in job responsibilities and disciplines between [Jones,

Eng, and Dixon] ... vitiate the relevancy of the comparison."
*Id.* at 340.

The Appellate Division also rejected Rutgers' claim that disclosure of the promotion and tenure material would impair the integrity of the peer review system. It noted that this system was already not one of strict confidentiality since the evaluation materials could be discoverable in a Title VII federal proceeding and the people being evaluated have access to all of their promotion packets except for outside evaluation letters. The court felt that any "chilling" that might result from disclosure was outweighed by "the demands of fair employment," and noted that such disclosure would "always [be] subject to appropriate protective measures." *Id.* at 341. The court also rejected Rutgers' claim of privilege based on academic freedom since such freedom, it said, "does not encompass disparate treatment in acting upon faculty promotions or the shielding of records which might reveal evidence of discrimination." *Id.* Finally, the court held that Rutgers' claim of protection from disclosure via *Evid.Rule* 34 (precluding disclosure of official information) was "clearly without merit," and that the Rutgers–AAUP collective bargaining agreement could not serve as a bar to disclosure since: (1) the DCR was not a party to that agreement, and (2) "[i]n any event, judicial considerations of the proper scope of compelled disclosure in a discrimination proceeding are not constrained by a collective bargaining agreement." *Id.* at 342.

The Appellate Division modified the ALJ's opinion only to provide additional protection to the University by prohibiting "disclosure of the material[s] to persons not involved in the proceedings." 215 *N.J.Super.* at 342. This Court granted Rutgers' motion for leave to appeal. 108 *N.J.* 199 (1987).

## II.

Before determining whether any of the confidential materials should be protected by a qualified privilege, we first must

determine whether the material is relevant to Dixon's efforts to prove sex discrimination. *Evid.Rule* 1(2) defines "relevant evidence" as "evidence having any tendency in reason to prove any material fact." Accordingly, the disputed confidential materials will be relevant if they assist Dixon in proving that there was "an intent to discriminate for an unlawful purpose." *Kearny Generating System v. Roper,* 184 *N.J.Super.* 253, 261 (App.Div.), certif. den., *Roper v. Kearny Generating System,* 91 *N.J.* 254 (1982).

This Court has counselled that the standards developed under related federal anti-discrimination provisions in Title VII of the Civil Rights Act of 1964, as amended, 42 *U.S.C.S.* §§ 2000e to 2000e–17 (Title VII), can be applied where "useful and fair" to the state law context in determining whether an unlawful discriminatory purpose is present. *Peper v. Princeton Univ. Bd. of Trustees,* 77 *N.J.* 55, 81 (1978). Thus in this case Dixon is attempting to prove discrimination by means of one of the most commonly accepted standards, namely, by showing that she was a victim of "disparate treatment." As noted by the *Peper* court,

[this] is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. [*Id.* at 81 (quoting *Teamsters v. United States,* 431 *U.S.* 324, 334 n. 15, 97 *S.Ct.* 1843, 1854 n. 15, 52 *L.Ed.*2d 396, 415 n. 15 (1977)).]

In trying to define the burden that must be met to show discrimination through disparate treatment, we have adopted a three step procedure: (1) the plaintiff must come forward with sufficient evidence to constitute a *prima facie* case of discrimination; (2) the defendant then must show a legitimate non-discriminatory reason for its decision; and (3) the plaintiff must then be given the opportunity to show that defendant's stated reason was merely a pretext or discriminatory in its application. *Peper, supra,* 77 *N.J.* at 82–83; *see McDonnell Douglas Corp. v. Green,* 411 *U.S.* 792, 807, 93 *S.Ct.* 1817, 1826, 36 *L.Ed.*2d 668, 680 (1973).

The initial burden of showing a *prima facie* case is met when the plaintiff shows that "it is more likely than not" that the employer's actions were based on unlawful considerations. *Furnco Constr. Corp. v. Waters*, 438 *U.S.* 567, 577, 98 *S.Ct.* 2943, 2949, 57 *L.Ed.*2d 957, 967 (1978). This determination, in turn, is made by having the plaintiff meet the requirements of a four-part test: (1) that she is a member of a class protected by the anti-discrimination law; (2) that she was qualified for the position or rank sought; (3) that she was denied promotion, reappointment, or tenure; and (4) that others (*i.e.*, males) with similar or lesser qualifications achieved the rank or position. *See Peper, supra*, 77 *N.J.* at 82–84 (using test developed in *McDonnell Douglas* as adopted for the academic context under the LAD); *Smith v. Univ. of North Carolina*, 632 *F.*2d 316, 340–41 (4th Cir.1980) (adopting *McDonnell Douglas* four part test to academic promotion context).[2]

Courts recognize that even in academic settings a plaintiff may show differential or disparate treatment by comparing his or her credentials with those of other faculty members. Although "[c]omparisons may be more difficult in the case of professional and academic employment decisions ... they may be essential to a determination of discrimination; and where they are, and where the evidence is available, they must be made." *Namenwirth v. Board of Regents of Univ. of Wis. System*, 769 *F.*2d 1235, 1241 (7th Cir.1985), *cert.* den., 474 *U.S.* 1061, 106 *S.Ct.* 807, 88 *L.Ed.*2d 782 (1986); *accord E.E.O.C. v. Franklin & Marshall College*, 775 *F.*2d 110, 116 (3d Cir.1985),

---

[2]In the Title VII context the United States Supreme Court "has expressly rejected the argument that meeting the specific *McDonnell Douglas* requirements is the 'only means' by which plaintiffs may make the requisite *prima facie* showing.... Thus, in ... cases involving institutions of higher learning, plaintiffs may establish their *prima facie* case by a sufficient showing as to the four *Smith* elements or by offering other evidence which creates the inference that the complained of act was unlawful." *Lynn v. Regents of the Univ. of California*, 656 *F.*2d 1337, 1341 (9th Cir.1981) (citing *Teamster v. United States*, 431 *U.S.* 324, 358, 97 *S.Ct.* 1843, 1866, 52 *L.Ed.*2d 396, 429 (1977)), *cert.* den., 459 *U.S.* 823, 103 *S.Ct.* 53, 74 *L.Ed.*2d 59 (1982).

*cert.* den., 476 *U.S.* 1163, 106 *S.Ct.* 2288, 90 *L.Ed.*2d 729 (1986); *O'Connor v. Peru State College*, 781 *F.*2d 632, 636 (8th Cir. 1986). To the extent that there is evidence that can be suitably used in a comparison, therefore, such evidence will be relevant in this case.

■ Rutgers contends, however, that a comparison of the promotion packets of Dixon, Jones, and Eng is not relevant and will not have a reasonable tendency to show that Dixon's failure to achieve promotion was due to her gender. This is so, Rutgers contends, because (1) the three professors had different assignments and job responsibilities; (2) each received markedly different weightings with regard to the five criteria employed for determining promotion and tenure; (3) each was considered at a different time by the Board of Governors; and (4) the promotion and tenure evaluation process does not provide for comparisons of candidates from different parts of the University at any level of the review process. We disagree and find that the requested confidential materials are relevant to Dixon's case.

Both the trier of fact and the Appellate Division rejected the claim that the positions of Dixon, Jones, and Eng were so different as to render any comparison of the three irrelevant.[3] *Dixon v. Rutgers Univ., supra,* 215 *N.J.Super.* at 340 ("We perceive no merit in Rutgers' contention that differences in job responsibilities and disciplines between these three academicians vitiate the relevancy of the comparison."); *Dixon v. Rutgers Univ.,* No. CRT3967–85, at 3, 8 (N.J. Office of Adm.Law Mar. 6, 1986) (flat declaration that the three professors were "similarly employed"). Even assuming their positions to be different, it does not necessarily follow that no comparisons may be drawn. There is no requirement that the

---

[3]This, however, does not preclude Rutgers from arguing in the pending administrative action that the tenure and promotion packages, which have not yet been examined by the court, prove that the three faculty members have positions too far apart for viable comparison.

persons involved have the exact same job requirements in order validly to be compared or that the evaluations be conducted at the same time. *See, e.g., Franklin & Marshall College, supra,* 775 *F.*2d at 117 (finding EEOC request to use records of all tenure candidates over a three and one-half year period for comparative analysis to not be overbroad); *Kunda v. Muhlenberg College,* 621 *F.*2d 532, 539 (3d Cir.1980) (comparing female member in Physical Education Department to a male in Classics Department).

Rutgers also alleges that even if Dixon's position is comparable to that of Jones and Eng, its decision with respect to Dixon was based solely on a gender-neutral assessment of Dixon's conduct in an unbiased peer review process. Courts have held, however, that such a defense provides no shield against the disclosure of promotion packets of male faculty members:

> In short, while defendants may choose to rely on alleged gender-neutral criteria, rather than the qualifications of other candidates, we think plaintiff is entitled to an opportunity to show that others with similar qualifications achieved the rank or position or that women at Harvard Business School are evaluated by a stricter standard than their male colleagues, or that the evaluations of plaintiff when compared with those of men who were granted tenure, reveal a covert bias against women faculty. [*Jackson v. Harvard Univ.,* 111 *F.R.D.* 472, 475–76 (D.Mass.1986) (citations omitted).]

Such reasoning is equally applicable to this case. Hence, we find that the promotion packets of Eng and Jones as well as the confidential records sought from Dixon's own promotion packet, namely, the letters from outside evaluators, are relevant in order for Dixon to establish her *prima facie* case, and to show that any countering explanations are mere pretext. Only through comparison can she show that male faculty members received promotion and tenure though less qualified; and only by comparing her record with others can she show that the rationale for her denied tenure and promotion was not equally applied to exclude others. *See Mozee v. Jeffboat,* 746 *F.*2d 365, 369 (7th Cir.1984).

### III.

■ Rutgers asserts, however, that even if the materials in question are relevant to Dixon's claim of sex discrimination, we should create a qualified privilege to preclude their discovery. Rutgers proposes that the plaintiff be granted access to the requested materials only on a showing of particularized need. We decline to create such a privilege.

Considerations involving the creation of a new privilege are made in light of the fundamental principle that "the public ... has a right to every man's evidence." 8 J. Wigmore, *Evidence* § 2191, at 70 (1961), *quoted in Trammel v. United States,* 445 *U.S.* 40, 50, 100 *S.Ct.* 906, 912, 63 *L.Ed.*2d 186, 195 (1980); *Branzburg v. Hayes,* 408 *U.S.* 665, 688, 92 *S.Ct.* 2646, 2660, 33 *L.Ed.*2d 626, 644 (1972); *United States v. Bryan,* 339 *U.S.* 323, 331, 70 *S.Ct.* 724, 730, 94 *L.Ed.* 884, 891 (1950). "[V]irtually every judicial inquiry begins with the goal of developing the facts. The basis of justice is the truth and [therefore] our system frowns upon impediments to ascertaining truth." *In re Dinnan,* 661 *F.*2d 426, 427 (5th Cir.1981), *cert.* den. sub nom. *Dinnan v. Blaubergs,* 457 *U.S.* 1106, 102 *S.Ct.* 2904, 73 *L.Ed.* 2d 1314 (1982); *see In re Selser,* 15 *N.J.* 393, 405 (1954) ("Since it results in the exclusion of evidence, the doctrine of privileged communication runs counter to the fundamental theory of our judicial system that the fullest disclosure of the facts will best lead to the truth and ultimately to the triumph of justice."). Thus, since privileges conceal the truth rather than advancing its ascertainment, courts have traditionally tended to restrict rather than create or expand them. *See, e.g., United States v. Nixon,* 418 *U.S.* 683, 709–710, 94 *S.Ct.* 3090, 3108–3109, 41 *L.Ed.*2d 1039, 1065 (1974) (privileges "are not lightly created nor expansively construed, for they are in derogation of the search for truth."); *Fellerman v. Bradley,* 99 *N.J.* 493, 502 (1985) (public policy in fullest disclosure of facts acting to create exceptions to lawyer-client privilege); *State v. Briley,* 53 *N.J.* 498 (1969) (refusing to permit marital privilege as a bar

against wife's testimony about husband's murder of third party when this arose in same transaction as his assault on her).

Despite their reluctance to do so, our courts have the power to create new privileges, *see, e.g., Hague v. Williams,* 37 *N.J.* 328, 336 (1962) (acknowledging qualified non-statutory physician-patient privilege); *Wylie v. Mills,* 195 *N.J.Super.* 332, 338 (Law Div.1984) (acknowledging qualified non-statutory privilege of self-examination or self-critical analysis); *cf. Berst v. Chipman,* 232 *Kan.* 180, 653 *P.*2d 107 (1982) (qualified privilege may exist independent of specific statutory privileges); *Fed.R.Evid.* 501 (privileges created based on "the principles of the common law as they may be interpreted by the courts ... in light of reason and experience."), and have done so whenever they have felt " 'that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.' " *Trammel, supra,* 445 *U.S.* at 50, 100 *S.Ct.* at 912, 63 *L.Ed.*2d at 195 (quoting *Elkins v. United States,* 364 *U.S.* 206, 234, 80 *S.Ct.* 1437, 1454, 4 *L.Ed.*2d 1669, 1695 (1960) (Frankfurter, J., dissenting)). "Thus, where there is no compelling justification for a new privilege, the vital truthseeking function of our justice system must carry the day." *Dinnan, supra,* 661 *F.*2d at 430. In order to determine whether sufficiently compelling reasons exist to create a new privilege, we must balance the interests that the proposed academic freedom privilege would further and the plaintiff's competing interest in obtaining information to support a *prima facie* case of sex discrimination.

Both Rutgers and *amicus curiae* Princeton University urge this Court to invoke a qualified academic freedom privilege to preclude the evidentiary use of the confidential materials. According to the universities, the reliability and integrity of the peer review system for faculty promotion and tenure depend on the confidentiality of both internal and external evaluations. Without a qualified academic freedom privilege, the universities argue, the peer review system would be seriously and substantially impaired, thereby undermining the excellence of their

faculties and the consequent excellence of their institutions. More specifically, they are concerned that allowing disclosure of confidential peer review materials will discourage candid evaluations by a tenure candidate's peers, including evaluators from other institutions. In sum, the universities consider disclosure of the type requested here to be uncharacteristically intrusive in light of the judiciary's general reluctance to interfere in university affairs.

The concept of academic freedom that the university invokes in support of its claim of privilege is not unfamiliar to the judiciary. The public interest in promoting higher education reflects the view that it "perform[s] an essential social function ...," *State v. Schmid*, 84 *N.J.* 535, 566 (1980), by promoting "the pursuit of truth, the discovery of new knowledge through scholarship and research, teaching and general development of students, and the transmission of knowledge and learning to society at large." *Id.* at 565 (quoting Princeton University Regulations); *see Keyishian v. Board of Regents*, 385 *U.S.* 589, 603, 87 *S.Ct.* 675, 683, 17 *L.Ed.*2d 629, 640 (1967) ("academic freedom ... is of transcedent value to all of us ... [as t]he Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth ...."). As a result of this interest, courts have developed a concept of "[a]cademic freedom, [which,] though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment." *Regents of the Univ. of California v. Bakke*, 438 *U.S.* 265, 312, 98 *S.Ct.* 2733, 2759, 57 *L.Ed.*2d 750, 785 (1978), *quoted in Snitow v. Rutgers Univ.*, 103 *N.J.* 116, 122 (1986). The extent of this academic freedom concept was charted thirty years ago by Justice Frankfurter in his oft-quoted concurrence in *Sweezy v. New Hampshire*, 354 *U.S.* 234, 263, 77 *S.Ct.* 1203, 1218, 1 *L.Ed.*2d 1311, 1332 (1957), when he spoke of "four essential freedoms" of universities, namely, the freedom to determine for themselves "on academic grounds who may teach, what may be

taught, how it shall be taught and who may be admitted to study."

In addressing the issue of academic freedom this Court has recognized the essential role that the selection of faculty plays in the development of academic institutions. In *Snitow, supra,* 103 *N.J.* at 123, we noted that "[n]o decision can more fully implicate an institution's academic responsibility than the decision to hire, promote, and retain teaching faculty." Since this selection process involves "[d]eterminations about such matters as teaching ability, research scholarship, and professional stature [that] are subjective, and [also] ... often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges," courts have traditionally been "vigilant not to intrude" into this area to the extent that such specialized knowledge is required. *Kunda v. Muhlenberg College, supra,* 621 *F.*2d at 548. Thus this Court has acknowledged and supported university peer review systems that make use of such specialized knowledge, noting that they provide " 'the most reliable method for assuring promotion of the candidates best qualified to serve the needs of ... [educational] institution[s].' " *Snitow, supra,* 103 *N.J.* at 122.

▮ The universities argue that in light of their academic freedom interests, peer review materials should be protected by a qualified privilege that could be overcome only on a showing of "particularized need" on the part of the plaintiff.[4] Under

---

4In a footnote in its brief Rutgers advances the additional argument that disclosure of their promotion packets would violate the privacy rights of Professors Jones and Eng. Without resolving the threshold issue of whether the University has standing to assert the professors' privacy claims, we note that such privacy interests must in an appropriate case give way to a competing public interest. *See Schachter v. Whalen,* 581 *F.*2d 35, 37 (2d Cir.1978) (State's interest in investigating physician charged with medical misconduct, when combined with measures to protect confidentiality, was strong enough to justify intrusion into privacy of physician's patients); *In re Martin,* 90 *N.J.* 295 (1982) (State interest reflected in Casino Control Act, *N.J.S.A.* 5:12–1 to –152, justified intrusion into privacy of prospective casino employees resulting from

the proposed "particularized need" standard, "the mere fact that certain information may be relevant or useful does not establish a 'particularized need' for disclosure of information. . . . The party seeking disclosure of the privileged information must show a 'compelling necessity' for the *specific* information requested." *E.E.O.C. v. Univ. of Notre Dame du Lac,* 715 *F.*2d 331, 338 (7th Cir.1983) (citations omitted). To date, four circuit courts have had occasion to adopt or reject various forms of the proposed qualified privilege in a Title VII context. Two of those courts have adopted the qualified privilege, *see Notre Dame, supra,* 715 *F.*2d 331, and *Gray v. Board of Higher Educ., City of New York,* 692 *F.*2d 901 (2d Cir.1982), while two others have rejected it, *see Franklin & Marshall College, supra,* 775 *F.*2d 110, and *Dinnan, supra,* 661 *F.*2d 426; *see also* Delano, *Discovery in University Employment Discrimination Suits: Should Peer Review Materials be Privileged?,* 14 *J. Coll. & Univ.L.* 121 (1987) (comparing various results in treatment of proposed privilege).

Rutgers also argues that various New Jersey cases provide a framework for the creation of a qualified privilege in the peer review context. *See Loigman v. Kimmelman,* 102 *N.J.* 98 (1986); *McClain v. College Hosp.,* 99 *N.J.* 346 (1985); *Nero v. Hyland,* 76 *N.J.* 213 (1978); *Wylie v. Mills, supra,* 195 *N.J.Super.* 332; and *State v. Kaszubinski,* 177 *N.J.Super.* 136 (Law Div.1980). In this connection, Rutgers attaches special significance to our decision in *McClain v. College Hosp.* There, a private party pursuing a wrongful death action sought discovery of the State Board of Medical Examiners' investigative records regarding a physician's conduct. We held that in order to warrant disclosure of the licensing board's confidential inves-

---

mandated disclosure of personal information by licensee applicants); *Lehrhaupt v. Flynn,* 140 *N.J.Super.* 250, 260–62 (App.Div.1976) (the public interest in disclosure of financial information outweighs an official's privacy interest). We find that the State's strong public policy against discrimination outweighs the privacy interests of Jones and Eng.

tigative records the party had to demonstrate that she had a particularized need for the records that outweighed the public interest in maintaining their confidentiality.

Like *McClain,* the remaining cases cited by the University to support its claim of privilege involved the balancing of private interests in disclosure against public interests in confidentiality. *See Loigman, supra,* 102 *N.J.* 98 (involving disclosure of county prosecutor's confidential account in context of prerogative writ action under Right-to-Know law); *Nero, supra,* 76 *N.J.* 213 (action brought under Right-to-Know law involving public interest in maintaining confidentiality of executive appointive process); *Wylie, supra,* 195 *N.J.Super.* 332 (suit by private party involving public interest in supporting confidential, self-critical analysis by private organizations); and *Kaszubinski, supra,* 177 *N.J.Super.* 136 (defendant sought disclosure of confidential in depth police personnel records). We find the university's reliance on the above cases to be unsupportive of its claim of privilege in the context of a discrimination suit. We reach this conclusion because each of the cited cases required the courts to balance *private* interests in disclosure against *public* interests in confidentiality. In the instant case we must balance the *public* interest in maintaining a confidential peer review process that protects the university's academic freedom against our State's strong *public* policy favoring disclosure and eradication of discriminatory treatment in employment.

The eradication of " 'the cancer of discrimination' " has long been one of our State's highest priorities. *Fuchilla v. Layman,* 109 *N.J.* 319, 334 (1988). Because of this state's strong public policy in favor of eliminating discrimination in the workplace, we held in *Fuchilla* that a plaintiff's failure to comply with the notice provisions of the New Jersey Tort Claims Act, *N.J.S.A.* 59:1–1 to 12–3, did not bar her discrimination claim under the LAD. As this Court noted earlier in *Peper, supra,* 77 *N.J.* at 80 "[e]mployment discrimination due to sex or any other invidious classification is peculiarly repugnant in a society which prides itself on judging each individual by his or her

merits." The right to be free from discrimination is firmly supported by the protections of Article I, paragraph 1 of the New Jersey Constitution of 1947, *see id.* at 77–80 and in the absence of legislation this alone could provide the basis for courts to act on the issue. *See King v. South Jersey Nat. Bank*, 66 *N.J.* 161, 177 (1974) ("Just as the Legislature cannot abridge constitutional rights by its enactments, it cannot curtail them through its silence, and the judicial obligation to protect the fundamental rights of individuals is as old as this country."). The state's Legislature, however, has indeed acted. The LAD reflects our belief that "discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions of a free democratic state." *N.J.S.A.* 10:5–3. This law, in turn, and the strong public policy it presents, has frequently been acknowledged by the state's courts. *See, e.g., Fuchilla v. Layman, supra,* 109 *N.J.* at 334–35; *Lige v. Town of Montclair,* 72 *N.J.* 5, 17 (1976); *Jackson v. Concord Co.,* 54 *N.J.* 113, 123 (1969).

The LAD does not exclude public educational institutions from the category of entities subject to its provisions. The definitional section of the LAD, *N.J.S.A.* 10:5–5(*l*), includes as a "place of public accommodation" to which the LAD must apply, any "college and university, or any educational institution under the supervision of the State Board of Education, or the Commissioner of Education of the State of New Jersey." While the LAD at one time did not apply to *private* universities, this has not been true since June 6, 1977, the effective date of the Act's 1977 amendments eliminating the exclusion. *L.* 1977, *c.* 122. *See Peper, supra,* 77 *N.J.* 55. This legislative action clearly shows the intent to eliminate discrimination in all of the State's universities, be they public or private.

Our Legislature's decision to subject academic institutions to the LAD reflects reasoning similar to that expressed by Congress when it acted in 1972 to eliminate the immunity previously extended to academic institutions from actions under Title VII. In so acting Congress stated that

discrimination in educational institutions is especially critical. The[re] ... [is no] more sensitive area than educational institutions where ... youth are exposed to a multitude of ideas that will strongly influence their future development. To permit discrimination here would, more than in any other area, tend to promote misconceptions leading to future patterns of discrimination.

H.R.Rep. No. 92–238, 92nd Cong., 2nd Sess. 19–20, *reprinted in* 1972 U.S.Code Cong. & Ad.News 2137, 2155, *quoted in Franklin & Marshall College, supra,* 775 *F.*2d at 115.

While we are mindful of the need to maintain the confidential nature of the peer review system, we believe that adoption of the qualified academic freedom privilege would interfere significantly with the enforcement of our anti-discrimination laws. Our Legislature, like Congress in the Title VII context, has made manifest its refusal to exempt academic institutions from the LAD's prohibition against discrimination. Although we note that in the instant case Rutgers acted in good faith by complying with the DCR's initial request for the materials, we are fearful that adoption of the proposed privilege would in the future "allow ... institutions to hide evidence of discrimination behind a wall of secrecy." *Franklin & Marshall College, supra,* 775 *F.*2d at 115; *see also Gray, supra,* 692 *F.*2d at 909 ("In the context of peer selection as well, academic freedom cannot be paramount to all other rights.... [A]cademic freedom is illusory when it does not protect faculty from censurious practices but rather serves as a veil for those who might act as censors."); *Dinnan, supra,* 661 *F.*2d at 431 ("academic freedom would shield the tenure committee from having to reveal its votes, even though the decision had nothing to do with academic grounds"). Our reluctance to allow institutions to conceal such valuable information is grounded in our belief that "confidential material pertaining to other candidates for tenure in a similar time frame may demonstrate that persons with lesser qualifications were granted tenure or that some pattern of discrimination appears." 775 *F.*2d at 116; *accord Namenwirth, supra,* 769 *F.*2d at 1240–1241. In our view, it would be unduly burdensome to make production of the confidential

materials contingent on the plaintiff's ability to demonstrate a "particularized need" for them. The effect of a privilege overcome only on a showing of particularized need would be to emasculate the force of our anti-discrimination laws in this context.

Our rejection of the proposed privilege should not be read to imply that we regard the University's confidentiality interest as insignificant. In fact, we do not consider our rejection of the proposed privilege and the preservation of a confidential peer review process to be mutually exclusive propositions. Trial courts may guarantee to the plaintiff the discovery of materials needed to support a *prima facie* case of discrimination, while at the same time ensuring that the manner and scope of discovery minimizes intrusion into the confidentiality of the peer review process.

Although we find that the confidential materials are not protected by a qualified privilege, we believe that "a plaintiff claiming discriminatory treatment ought not to be entitled to a general inquisition into the University's files merely on the strength of having filed a complaint." *Zaustinsky v. University of California*, 96 *F.R.D.* 622, 625 (1983). A plaintiff must do more than merely allege that a university has violated the LAD. The Supreme Court in *EEOC v. Shell Oil Co.*, 466 *U.S.* 54, 104 *S.Ct.* 1621, 80 *L.Ed.*2d 41 (1984), addressed an employer's contention that a court in deciding whether to enforce a subpoena issued by the EEOC should determine whether the charge of discrimination is well-founded, verifiable, or based on reasonable suspicion. The Supreme Court rejected that proposition but noted that

[t]he district court has a responsibility to satisfy itself that the charge is valid and that the material requested is 'relevant' to the charge, [citation omitted] and more generally to assess any contentions by the employer that the demand for information is too indefinite or has been made for an illegitimate purpose. [citations omitted] However, any effort by the court to assess the likelihood that the Commission would be able to prove the claims made in the charge would be reversible error.

[*Id.* at 72 n. 26, 104 *S.Ct.* at 1632 n. 26, 80 *L.Ed.*2d at 59 n. 26.]

Likewise, a court reviewing Dixon's request has a similar responsibility, namely, to satisfy itself that the discrimination charge is valid and the material requested is relevant.

In fulfilling this responsibility the trial court should examine the strength of the complaint by considering various objective factors, including but not limited to

> the adequacy of the reasons offered in defense of the decision [to deny tenure], the adequacy of the review procedures internal to the institution, statistical evidence that might give rise to an inference of discrimination, [and] factual assertions of statements or incidents that indicate personal bias or prejudices on the part of the participants.... [American Association of University Professors, A Preliminary Statement on Judicially Compelled Disclosure in the Nonrenewal of Faculty Appointments, 67 *Academe* 27, 28 (1981) (hereinafter *Academe*).]

By way of illustration, a female professor who teaches in a college whose faculty is 75% female and who alleges sex discrimination obviously presents a less compelling case for disclosure of confidential materials than does a similarly situated professor at an institution whose all-male faculty has denied tenure to every eligible female to be considered for tenure and promotion. By requiring the plaintiff to demonstrate that the claim is valid and the material relevant, we intend to place only a modest burden on the plaintiff. We therefore encourage plaintiffs to state their allegations with sufficient particularity, incorporating into the pleadings any and all information obtained from sources other than the requested materials. By doing so, plaintiffs will provide the trial court with ample information from which to determine whether there is any factual predicate underlying the claim. *N.J.S.A.* 10:5-13 provides in part:

> [A] verified complaint ... shall state the name and address of the person ... alleged to have committed the unlawful employment practice or unlawful discrimination complained of and which shall set forth the particulars thereof and shall contain such other information as may be required.

Once the trial court has determined that the plaintiff's claim of discrimination is valid, it must determine whether the materials the plaintiff has requested are in fact relevant to the plaintiff's efforts to establish his or her *prima facie* case. In

making its relevancy determination, the trial court may also consider "the availability of the information sought from other sources, and the importance of the information sought to the issues presented." *Academe, supra,* at 28. If the court concludes that all or portions of the requested materials are relevant to the plaintiff's case, it may then compel their disclosure to the plaintiff.

Before giving the plaintiff access to the confidential materials, however, the trial court should take various measures designed to minimize intrusion into their confidentiality. In this connection, we rely on "practical, common-sense applications of rules of discovery that are familiar to trial courts in order to resolve most of the problems of confidentiality." *McClain, supra,* 99 *N.J.* at 361. As the court noted in *Jepsen,* 610 *F.*2d 1379, 1385 (1980), "[a]ny danger that the confidentiality of these records will be violated may be prevented by entry of ... protective orders." *See also* Delano, *supra,* at 150–51 (advocating use of protective orders as "one way to promote candor and to minimize the disruption of faculty relations without denying the plaintiff important evidence"). Although the protective measures a trial court may choose to employ will vary according to the circumstances of each case, we recommend that compelled disclosure of confidential peer review materials be accompanied by a protective order that limits access to persons directly involved in the case. Such access should be limited to the parties, their experts, and their attorneys.

Courts may also order that the documents from the files be used at depositions only of the witness who wrote the document, or who would otherwise be familiar with it, or who would have access to it independently pursuant to university regulations. Courts may also order that relevant portions of the deposition transcripts be sealed and not filed unless required in a subsequent proceeding. Courts may further require that the materials be used only in the specific litigation and be returned to the university after the litigation. Such protective

measures will limit the dissemination of the confidential materials and will provide some assurance to the university that the peer review materials will not be unnecessarily exposed to the public.

In addition to limiting the access of the confidential materials, the court also may issue protective orders relating to the scope of disclosure. To further protect the confidentiality of the requested peer review materials, we recommend that the trial court permit a university to redact names and other identifying features contained in the promotion packets. After completing the redaction process, the university should provide the court with both original and redacted copies of the files. The court would then review the files *in camera* to determine that nothing significant has been excluded. If the court concludes that nothing significant has been excluded, the redacted version should then be given to the plaintiff and the unredacted file returned to the university. The plaintiff will then have an opportunity to argue that the deleted material is relevant. In our view, this redaction procedure, combined with an order limiting access only to those involved in the proceedings, is the best and fairest means of accommodating the University's interest in confidentiality and the plaintiff's interest in establishing a *prima facie* case of discrimination.

In light of the foregoing analysis, we conclude that the lower courts in this case were justified in granting Dixon access to the confidential materials for purposes of establishing a *prima facie* case of sex discrimination. We are satisfied that Dixon demonstrated her ability to establish a *prima facie* case. She did so, in our view, by demonstrating that a factual predicate existed sufficient to warrant disclosure of the confidential files. The DCR's Finding of Probable Cause provided a cogent expression of that factual predicate. We note in this connection that the source of the information that gave rise to the DCR's Finding of Probable Cause and the materials that the plaintiff now seeks to use in the context of the proceedings are one and the same. This is so because although Rutgers assisted the

DCR in its initial investigation by complying with its request for the files, it later objected to the DCR's use of the materials in the context of the proceeding. We commend Rutgers' cooperative posture with regard to the investigation and are confident that the University's own interest in eradicating discrimination will lead to future cooperation.

We likewise find that the materials that the plaintiff intends to use in the proceedings are highly relevant to her establishment of a *prima facie* case of discrimination. As we discussed, *supra*, at 443, such comparative materials are crucial in the context of a disparate treatment case. At the outset, we note that Dixon's request for comparative peer review materials is very limited. Plaintiff requested only two promotion packets, those of Jones and Eng, and the reports of the outside evaluators of her own work. *Cf. Franklin & Marshall College, supra,* 775 *F.*2d at 112 (plaintiff requested numerous documents for each faculty member granted and denied tenure for the period from 1977 to 1981); *Jepsen v. Florida Bd. of Regents,* 610 *F.*2d 1379, 1384 (5th Cir.1980) (plaintiff given access to evaluation forms of fourteen fellow English professors where university defended claim of sex discrimination on the grounds that promotional decisions were based solely on unbiased faculty evaluations).

Moreover, the fact that the courts below entered protective orders of the type discussed above lends further support to our conclusion that the materials are properly discoverable in this case. The ALJ determined that "the confidentiality of letters from outside sources were to be protected by excision of the authors' names from the documents 'so long as Rutgers did not place greater weight on one outside specialist over another because of reputation in the academic community.' " *Dixon v. Rutgers Univ., supra,* 215 *N.J.Super.* at 336–37. We believe this protective measure, combined with the Appellate Division's order limiting access to those involved in the proceedings, will be effective in preserving the confidentiality of the materials. However, before permitting the plaintiff's evidentiary use of

the materials, we instruct the trial court on remand to allow the University to invoke the redaction procedure described above.

## IV.

▮ We briefly address the University's further contention that a provision in the collective bargaining agreement between Rutgers and the AAUP, which restricts access to personnel files to named persons, now precludes evidentiary use of the materials. According to Rutgers, even if there were no applicable privilege, the DCR would still be barred from access to the University's confidential records because it stands in Dixon's shoes and thus is bound by the collective bargaining agreement (the contract) that she signed. This assertion, however, is inaccurate. As stated by this Court in *Jackson v. Concord Co.*, *supra*, 54 *N.J.* at 124–25 it is clear that the Legislature, in creating the DCR,

> intended to create an effective enforcement agency in order to eradicate the cancer of discrimination. Even in the case of an individual complainant, it is plain that the public interest is involved. Discrimination, by its very nature, is directed against an entire class ... [and s]o the law seeks not only to give redress to the individual who complains, but moreover to eliminate and prevent all such future conduct ... by enjoining further discriminatory practices as to all persons ...

Thus, the DCR has a completely separate law enforcement interest in prosecuting the alleged discrimination and does not merely act as Dixon's attorney or stand in her shoes. *See David v. Vesta Co.*, 45 *N.J.* 301, 327 (1965) ("[P]revention of unlawful discrimination vindicates not only the rights of individuals but also the vital interest of the State.... [D]iscrimination is regarded as a public wrong and not merely the basis of a private grievance."); *Robinson v. Branch Brook Manor Apartments*, 101 *N.J.Super.* 117, 124 (App.Div.), certif. den., 52 *N.J.* 487 (1968) (the LAD is "designed to vindicate the rights of the public, as well as those of the individual complaint, against unlawful discrimination."); *N.J.S.A.* 10:5–14.1 (Attorney General directed to enforce LAD after complaint is filed). Therefore the DCR is not bound by the contract.

■ Even if Dixon were viewed as the party requesting the admission of the materials, the contract could still not be used as a bar against their use as evidence. Although it is true that, as a general rule, terms of a collectively negotiated agreement are binding upon the employees covered by it, *see Bogue v. Board of Review*, 21 *N.J.* 431, 435 (1956) ("a collective bargaining agreement ... is enforceable by and against individual members of the union in matters which affect them peculiarly ..."), this rule cannot be used to bar access in situations such as this. In *Thornton v. Potamkin Chevrolet*, 94 *N.J.* 1 (1983), this Court ruled that contractual grievance procedures cannot deprive one of separate statutory rights under the LAD. *See also Teaneck Bd. of Educ. v. Teaneck Teachers Ass'n*, 94 *N.J.* 9 (1983) (public employer and its union cannot agree to arbitrate promotion discrimination claims; Legislature has committed resolution of these claims to DCR). In its view, "the relationship between the [grievance and statutory] forums is complementary since consideration of the claim by both forums may promote the policies underlying each." *Thornton, supra*, 94 *N.J.* at 7 (quoting *Alexander v. Gardner–Denver Co.*, 415 *U.S.* 36, 50–51, 94 *S.Ct.* 1011, 1020–1021, 39 *L.Ed.*2d 147, 159 (1974)); *cf. W.R. Grace & Co. v. Local Union 759*, 461 *U.S.* 757, 103 *S.Ct.* 2177, 76 *L.Ed.*2d 298 (1983) (Title VII conciliation process and collective bargaining process are complementary rather than conflicting). Thus, while the contractual terms in Dixon's contract may limit her access to the records in question for purposes of university procedure, they do not affect their use in the complementary determinations done under the LAD.

Even if the parties had been capable of agreeing to prohibit access to peer review materials, it is not clear that they have done so here. Under New Jersey law for a waiver of rights to be effective it must be plainly expressed. *See State v. Bellucci*, 81 *N.J.* 531, 544 (1980); *State v. Morgenstein*, 147 *N.J.Super.* 234 (App.Div.1977); *cf. Metropolitan Edison Co. v. NLRB*, 460 *U.S.* 693, 708, 103 *S.Ct.* 1467, 1477, 75 *L.Ed.*2d 387, 400 (1983) (to be effective a waiver must be "clear and unmistak-

able"). This was not done in this case. Consequently, we find the University's contention to be without merit, and affirm the Appellate Division's judgment in this regard. *Dixon v. Rutgers Univ., supra*, 215 *N.J.Super.* at 341–42.

## V.

Our State's strong public interest in eradicating discrimination in employment outweighs the public interest in preserving the confidentiality of peer review material through the creation of a qualified academic freedom privilege. Academic freedom cannot be used as a shield to conceal discrimination. Hence, we do not create a qualified privilege to protect the confidentiality of peer review materials used by a university in its tenure and promotion decisions. Instead we find that the use of protective orders that substantially limit access to the materials and provide for redaction procedures will best accommodate the competing interests. Furthermore, we reject the University's contention that the Rutgers–AAUP collective bargaining agreement precludes discovery of the materials. We thus affirm the Appellate Division judgment as modified.

O'HERN, Justice, concurring.

In this case the Court has carefully balanced a university's interest in academic freedom against the interests of faculty members to be free from discrimination.

Whether we denote the balance of interests as a qualified privilege with respect to production of evidence or as a protective order in aid of a litigant, under *Evidence Rule* 4 the underlying search for values remains the same. While I agree that "exceptions to the demand for every man's evidence are not lightly created nor expansively construed," *United States v. Nixon*, 418 *U.S.* 683, 710, 94 *S.Ct.* 3090, 3108, 41 *L.Ed.*2d 1039, 1065 (1974), we must not lightly value a university's interest in academic freedom, since "though not a specifically enumerated constitutional right, [the concept] long has been viewed as a

special concern of the First Amendment." *Regents of the Univ. of California v. Bakke*, 438 *U.S.* 265, 312, 98 *S.Ct.* 2733, 2759, 57 *L.Ed.*2d 750, 785 (1978) (Powell, J., announcing Court's judgment and expressing his views of case). " '[T]he four essential freedoms' of a university" have been said to include the freedom " 'to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught and who may be admitted to study.' " *Sweezy v. New Hampshire*, 354 *U.S.* 234, 263, 77 *S.Ct.* 1203, 1218, 1 *L.Ed.*2d 1311, 1332 (1957) (Frankfurter, J., concurring) (citation omitted).

The federal courts are divided on whether to denote the policy values at stake as raising a question of "qualified academic freedom," *E.E.O.C. v. University of Notre Dame du Lac*, 715 *F.*2d 331, 337–38 (7th Cir.1983), or of a balancing of interests, *Lynn v. Regents of the Univ. of California*, 656 *F.*2d 1337, 1347 (9th Cir.1981), *cert. denied*, 459 *U.S.* 823, 103 *S.Ct.* 53, 74 *L.Ed.*2d 59 (1982). Even in *E.E.O.C. v. Franklin & Marshall College*, 775 *F.*2d 110 (3rd Cir.1985), *cert. denied*, 476 *U.S.* 1163, 106 *S.Ct.* 2288, 90 *L.Ed.*2d 729 (1986), where the Court held that there was no academic privilege, the E.E.O.C. had already agreed before the district court to accept the requested materials with identifying characteristics of the authors removed. 775 *F.*2d at 117. I think it best to speak directly of the recognition of a qualified academic privilege.

Perhaps Judge Oakes of the Second Circuit expressed the competing interests best when he stated that recognition of a privilege reflects a balance

carefully designed to protect confidentiality and encourage a candid peer review process. It strikes an appropriate balance between academic freedom and educational excellence on the one hand and individual rights to fair consideration on the other, so that courts may steer the "careful course between excessive intervention in the affairs of the university and the unwarranted tolerance of unlawful behavior * * *." [*Gray v. Board of Higher Educ.*, 692 *F.*2d 901, 907–08 (2nd Cir.1982) (quoting *Powell v. Syracuse Univ.*, 580 *F.*2d 1150, 1154 (2d Cir.), *cert. denied*, 439 *U.S.* 984, 99 *S.Ct.* 576, 58 *L.Ed.*2d 656 (1978)).]

I would steer that careful course by recognizing, as I think the Court does, discretion in the court or tribunal to view the

requested materials to determine whether they are necessary to establish the plaintiff's claim. If the court concludes that the requested materials are relevant, protective measures should be taken to delete such identifying information as would destroy the confidentiality of peer review and to prevent the further dissemination of the materials. I recognize that "enforcement of laws that ban discrimination will [not] always be without cost to other values, including constitutional rights * * * [but] respect for academic freedom requires some deference to the judgment of schools and universities as to the qualifications of professors, particularly those considered for tenure positions." *Hishon v. King & Spalding,* 467 *U.S.* 69, 80 n. 4, 104 *S.Ct.* 2229, 2236 n. 4, 81 *L.Ed.*2d 59, 70 n. 4 (1984) (Powell, J., concurring).

What we must avoid at all costs is the pursuit of mediocrity that can result from judicially supervised academic decisions. Tenure and promotion processes invariably involve the most solemn educational actions of a university. *Snitow v. Rutgers Univ.,* 103 *N.J.* 116, 123 (1986). Courts that recognize the qualified academic privilege "seek to foster frank and candid evaluation of candidates by their colleagues during hiring and tenure review committee deliberations." R. Allen & C. Hazelwood, "Preserving the Confidentiality of Internal Corporate Investigations," 12 *J.Corp.L.* 355, 362 n. 63 (1987). What they seek to avoid are the vapid generalities and euphemisms that supplant "telling it like it is."

When a promotion or retention file betrays no hint of gender or racial bias, a court may sensitively balance the competing interests by ordering appropriate disclosure conditions. The process is a familiar one that we have reviewed in recent cases involving access to sensitive information. We have repeatedly emphasized that the focus must always be on "the character of the materials sought to be disclosed." *State v. Doliner,* 96 *N.J.* 236, 248 (1984). Armed by the parties with a qualitative description of the materials, the trial court will be in a position to balance the claimant's interest in the information against the

potential adverse consequences of disclosure and the university's need for confidentiality. In the court's balancing of these interests, some of the considerations that may be examined will include: (1) the extent to which disclosure will impede the university's functions by discouraging academics from providing information to the university; (2) the effect disclosure may have on persons who have already given such information, and whether they did so in reliance that their identities would be not disclosed; (3) the extent to which university evaluations and promotion and tenure decisions will be chilled by disclosure; (4) the degree to which the information sought includes factual data as opposed to subjective evaluations; and (5) whether any subsequent circumstances have circumscribed the candidate's need for the materials.

Against these and any other relevant factors shall be balanced the importance of the information sought to the candidate's vindication of the public interest in discrimination-free employment.

O'HERN, J., concurring in the result.

*For affirmance and modification*—Chief Justice WILENTZ and Justices, CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed* —None.