851 A.2d 1 (2003)
370 N.J. Super. 140
Evalyn "June" PILKINGTON, Plaintiff-Appellant,
v.
BALLY'S PARK PLACE, INC., Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted February 13, 2003.
Decided October 15, 2003.
*2 Arlene Gilbert Groch, Somers Point, for appellant.
Sills, Cummis, Radin, Tischman, Epstein & Gross, Newark, for respondent (David W. Garland, of counsel; Mr. Garland and Jerrold J. Wohlgemuth, on the brief).
Before Judges WEFING, WECKER and FUENTES.
The opinion of the court was delivered by WEFING, J.A.D.
The trial court granted defendant's motion for summary judgment, dismissing plaintiff's complaint in which she alleged employment discrimination in violation of the Law Against Discrimination, N.J.S.A. 10:5-1 to -49 ("LAD"). Plaintiff has appealed from that order. After reviewing the record in light of the contentions advanced on appeal, we affirm.
The matter has had an unfortunate, protracted procedural history, which, in our judgment, it is not necessary to consider to resolve the issue before us. We turn directly to the undisputed facts.
Plaintiff has worked in the gaming industry since 1961. From 1961 to 1979 she worked as a casino dealer in Nevada. During the course of that employment she dealt all major games, including craps. Her professional involvement with craps, however, ceased in either 1965 or 1966. In 1979 plaintiff moved to New Jersey and commenced work at Bally's Park Place Casino in Atlantic City as a pit manager.
*3 She served in that capacity for seventeen years, from 1979 to 1996. Her duties as a pit manager included supervising all dealers and floor personnel in a designated gaming area known as a "pit." While employed with defendant, plaintiff obtained licenses in blackjack, roulette, pow gai poker, baccarat and mini-baccarat. As a pit manager for defendant, plaintiff acted in a supervisory capacity and did not deal any of these games herself.
Plaintiff had no involvement at all with craps while working for defendant. She did not supervise any craps tables at defendant's casino and never obtained a New Jersey license to deal craps.
Plaintiff received positive performance evaluations as a pit manager. Her written evaluations for the years 1994, 1995 and 1996 are part of the record before us. She consistently received the highest rating for knowledge of her position. She was considered particularly good at keeping management informed of problems that might develop before they escalated and was rated an excellent pit manager. These evaluations did note that plaintiff needed to improve her reactions to criticism from subordinates and management.
In October 1996 defendant posted a notice of an opening for the position of "Dual Rated Shift Manager." This position is ranked one level higher than pit manager and plaintiff applied for the position because it represented a promotion for her. The notice described the position as being:
Responsible for the operation and supervision of the gaming area for a shift when functioning as an assistant shift manager and for supervising the operation and activities of the table games when functioning as a pit manager.
The notice specified that a candidate was required to hold a license as a key shift manager. The form had space to indicate the educational/work experience required for this position, into which the following was inserted:
Must demonstrate completion of Casino Control Commission regulations through knowledge of all games. Must have knowledge of casino operations, rules, regulations, policies and procedures. Knowledge of management techniques which ensure proper morale and efficiency.
When plaintiff submitted her application for this promotion, she was fifty-nine years old and it had been at least thirty years since she had any professional contact with craps.[1]
Deposition testimony demonstrated that in October 1996 the regulations of the Casino Control Commission required that a dual shift manager have "knowledge of all games" and defined that term as either holding licenses in all games, being a graduate of a gaming school in New Jersey or having dealt a game a set number of hours. For craps, one hundred eighty hours of training and instruction were required.
Deposition testimony also revealed that approximately five people were promoted to the position of dual shift manager between 1994 and 1999. All of these individuals were either licensed in all games, had the required schooling or an affidavit showing they had a sufficient number of hours dealing a game in which they may not have held a license.
Through the course of discovery, plaintiff found only one instance in which a person was promoted to the position of *4 dual shift manager without having demonstrated the requisite "knowledge of all games." In 1988, eight years prior to the incident in question, Samuel Rosetti was promoted to dual shift manager without the requisite knowledge of baccarat or roulette. Rosetti testified that he was required to stay in the position of pit manager until he cured this deficiency. He testified at his deposition in the following manner.
Q. How long after getting the position of shift manager did you take those games [roulette and baccarat]?
A. Immediately.
* * *
Q. Well, you say you were promoted to shift manager but you were a pit manager. What does that mean?
A. Well, I was paid as a pit manager... [and] I couldn't make any decisions as far as the CCC [Casino Control Commission] was concerned.
Q. All right. So what makes you think you were a shift manager at that point?
A. Well, I was going to be a shift manager.
Q. You'd been told you were going to get the position; is that correct?
A. Yes.
Q. So, ... the job ... was yours and all you had to do in order to actively become a shift manager was to take these couple of games, correct?
Although never reduced to writing, defendant also had a policy that employees who had received written disciplinary notices would be ineligible for any promotion for a period of one year from the date of the infraction. For at least the three years preceding her application for promotion, plaintiff did not receive any written disciplinary notices.
After submitting her application for this promotion, plaintiff was interviewed by Rosetti, the one individual who had been promoted to shift manager without "knowledge of all games."[2] After the interview, Rosetti included the written notation, "no knowledge of craps."
Twelve persons applied for this opening. The successful candidate was Nadine Vitrano, who was forty-years-old. Ms. Vitrano had the same licenses as plaintiff but, in addition, was licensed in craps. She also held a key shift manager's license. Ms. Vitrano, however, had been subject to several disciplinary actions, the most recent of which, for a ten thousand dollar oversight, had occurred on November 8, 1996, approximately two weeks before she was promoted. She had received four disciplinary actions between March 1995 and August 1996.
Plaintiff was immensely distressed at her failure to receive this promotion. She discussed her distress with several of her co-workers, who urged her not to do anything rash. One in particular noted that she held a good job that paid her an annual salary of seventy thousand dollars. Five days after Ms. Vitrano's promotion was announced, however, plaintiff walked off the job without any notice to her superiors and did not return to work. Several days later she received a letter from defendant, enclosing a check for two weeks vacation pay. The letter stated that defendant considered her action in leaving a "voluntary, unsolicited resignation" and that her personnel record would indicate "resignation for personal reasons effective *5 November 30, 1996 [the day she left], with rehire eligibility."
After a short period of time, having considered the statement that she was eligible to be rehired, plaintiff approached defendant to see if it would rehire her. It refused to do so, however, and this litigation ensued.
By the time defendant moved for summary judgment, plaintiff's complaint asserted two claims, that defendant discriminated against her on the ground of age when it promoted Ms. Vitrano, in violation of LAD, and unlawful retaliation in refusing to rehire her and not affording her a grievance hearing.[3]
The standard governing trial court disposition of motions for summary judgment is well known. There is no need to burden this opinion with an extensive discussion of the matter. Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2. Brill v. Guardian Life Ins. Co., 142 N.J. 520, 666 A.2d 146 (1995).
When an appellate court reviews a summary judgment order, "the propriety of the trial court's order is a legal, not a factual, question." Pressler, Current N.J. Court Rules, comment 2.1 on R. 2:10-1 (2003). In making its determination, the appellate court does not owe any special deference to the trial court's legal conclusions. Manalapan Realty v. Township Comm., 140 N.J. 366, 378, 658 A.2d 1230, 1236-37 (1995). An appellate court will conduct a de novo review, applying the standard enunciated in Brill, supra, to the summary judgment motion on the basis of "the case only as it had been unfolded to that point and the evidential material submitted on that motion." Ji v. Palmer, 333 N.J.Super. 451, 463-64, 755 A.2d 1221, 1229 (App.Div.2000) (quotations and citations omitted).
To defeat a motion for summary judgment, a party in plaintiff's position must show that she has established a prima facie case of discrimination under LAD. The elements of a prima facie case of alleged discrimination based on a failure to promote are adapted from the burden-shifting framework first announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In opposing defendant's motion, plaintiff was required to present credible evidence that: (1) she was a member of a protected class under LAD; (2) she was qualified for the promotion she was seeking; (3) she was denied the promotion; and (4) the position was given to a significantly younger person. Kelly v. Bally's Grand, Inc., 285 N.J.Super. 422, 429, 667 A.2d 355 (App.Div.1995).
If a party is able to establish those four elements, discrimination is presumed and the burden shifts to the employer to articulate a legitimate and non-discriminatory reason for its action. If the employer does articulate such a legitimate reason for its action, the burden then shifts back to the plaintiff to demonstrate that the proffered reason is pretextual. Greenberg v. Camden County Vocational & Technical Schools, 310 N.J.Super. 189, 199, 708 A.2d 460, 465-66 (App.Div.1998); Kelly, supra, 285 N.J.Super. at 430, 667 A.2d at 359-60.
If a plaintiff is unable to establish those four threshold elements, the employer is entitled to summary judgment. We *6 are satisfied that while plaintiff satisfied three of the four required elements, she did not fulfill the posted requirement for "knowledge of all games" and was, thus, unable to establish the second prong, that she was qualified for the promotion that she was seeking.
Plaintiff points to Rosetti's promotion eight years earlier and relies upon Greenberg v. Camden County Vocational & Technical Schools, supra, to support her contention that she did, in fact, make a sufficient showing that she was qualified for the position of dual shift manager. In our judgment, Greenberg provides no support for plaintiff but rather demonstrates the insufficiency of her evidence.
Plaintiff in that case was a forty-eight-year-old teacher who was not rehired by her employer, Camden County Vocational and Technical Schools, and in consequence, denied tenure. She sued, alleging age discrimination, and we reversed the trial court's granting of summary judgment. Id. at 192, 708 A.2d at 462. To support her claim of age discrimination, plaintiff reviewed the district's rehiring decisions for several of the preceding years. Id. at 195, 708 A.2d at 463-64. She submitted these figures to the court, demonstrating that thirteen teachers had been evaluated for tenure over the preceding three years, and that no female more than forty-five years old had been rehired and received tenure. By contrast, three women less than forty-five years old had been given tenure. In addition, no male teacher more than forty-five years old had been denied tenure in the same time period. Id. at 196, 708 A.2d at 464. The district defended its decision not to rehire plaintiff, pointing to the fact that she received several "memos of concern" in each academic year. We concluded that such an assertion constituted a response from the employer, once a prima facie case was established, and did not go to the question whether plaintiff was qualified.
In discussing this matter, we considered the question of qualifications in terms of the second prong of the burden-shifting framework to be an objective one. We cited, for instance, Matczak v. Frankford Candy & Chocolate Co., 136 F.3d 933, 939 (3d Cir.1997) in which that court noted that "once it is determined that [a plaintiff] `was objectively qualified for the job, [the court] should not have required [plaintiff] to demonstrate that his performance met his employer's subjective expectations."
In our view, by any objective measure, plaintiff did not qualify for the position of dual shift manager because of her lack of demonstrated proficiency in craps. This void in her resume cannot be filled by pointing to one incident, eight years earlier, when defendant permitted Rosetti to obtain the necessary licenses before formally awarding him the post of dual shift manager. There can be no comparison, in our judgment, between that one isolated incident and the statistics assembled by plaintiff in Greenberg, supra. That incident, singular and remote in time, cannot constitute proof that defendant had a pattern of waiving the posted qualifications for a particular job.
We know nothing of the circumstances surrounding the decision made years earlier to permit Rosetti the opportunity to obtain the licenses he lacked. Nor do we think it appropriate at this juncture to revisit that question. We perceive no justification, however, for using that one decision as a basis not to permit defendant employer in 1996 to insist that applicants for the post of dual shift manager meet the posted qualifications for that job. We note also that we are not called upon to consider whether Rosetti's advancement in 1988 in some manner disadvantaged plaintiff's chances of advancement in 1996. We are *7 concerned, moreover, that permitting the accommodation which plaintiff seeks (the opportunity to obtain a craps license) could well prove unfair to other candidates who relied on the posted qualifications.
We turn finally to plaintiff's claim of retaliation. The LAD declares it to be unlawful discrimination:
d. For any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has filed a complaint, testified or assisted in any proceeding under this act or to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act.
[N.J.S.A. 10:5-12.]
To establish a prima facie case of prohibited retaliation, the claimant must demonstrate that: (1) she engaged in a protected activity known to her employer, (2) she was subjected thereafter to an adverse employment decision by the employer, and (3) there was a causal link between the two. Jamison v. Rockaway Township Bd. of Educ., 242 N.J.Super. 436, 445, 577 A.2d 177, 182 (App.Div.1990).
Plaintiff's argument is that Bally's either knew or should have known that she had a grievance based upon age discrimination because she was not promoted to the position she sought. Plaintiff argues that she did advise DeLury, Bally's counsel, that she wanted a grievance hearing;[4] however, that was after she walked off the job and was formally terminated from employment with Bally's.
We agree with the motion judge's determination that plaintiff's allegation that her employer knew that she was "engaged in protected activity" is far too speculative to support her claim. We see no basis for plaintiff's claim that Bally's refusal to rehire her was retaliatory.
The CARB grievance was available to "employees," not former employees. By the time plaintiff called DeLury, she had been sent a notice stating that her decision to leave Bally's and not to return to work for four or five days, without explanation to her superiors, was considered voluntary termination of her employment. Plaintiff took no action until nearly two weeks later, at which time she called Bally's legal department and requested to be re-instated. At that point, she was no longer an employee of Bally's. Apart from ordinary rules of courtesy, DeLury had no obligation to return the call, and Bally's had no obligation to reinstate her at that point.
Plaintiff cannot meet the elements of the claim because she cannot establish that at the time DeLury (on Bally's behalf) declined to respond to her request to be rehired, or to have a "grievance" hearing, plaintiff was engaged in protected conduct of which DeLury was aware. There is nothing in the record from which a reasonable inference can be drawn that plaintiff had brought a protected age discrimination claim in any forum, and that defendant was aware of it. Cf. Erickson v. Marsh & McLennan Co., 117 N.J. 539, 560, 569 A.2d 793, 803-04 (1990); Velantzas v. Colgate-Palmolive Co., Inc. 109 N.J. 189, 193 n. 1, 536 A.2d 237, 238 n. 1 (1988). Plaintiff's contention that her intention to do so was known to several co-workers and "must have" been conveyed to DeLury, is *8 insufficient. Neither of the persons she cites held a high-level management position such as to impute their knowledge to Bally's. See Cavuoti v. New Jersey Transit Corp., 161 N.J. 107, 123-24, 735 A.2d 548, 557-58 (1999).
Even if we were to conclude that an individual's contemplation of protected activity itself constitutes protected activity (which we do not), the inference that DeLury or any other high-level manager knew of that intention is too speculative to meet the required element of a prima facie case of retaliation.
We add the following brief comments in light of the remarks of our concurring and dissenting colleague. We have not held, as our colleague apparently believes we have, that "the law requires evidence of a pattern of inconsistency at the prima facie stage" (opinion at 168, 851 A.2d at 17). There may indeed be instances in which "one case [of waiver] of a purported job requirement [may be sufficient] to demonstrate that it was not a genuine, objective measure of qualification for the position." Ibid. Here, not only is there absence of a pattern, the only instance to which plaintiff can point is remote in time.
In our judgment, neither of the Third Circuit cases cited by our colleague warrants anything other than an affirmance of the trial court's order granting summary judgment to defendant. In Bennun v. Rutgers State Univ., 941 F.2d 154 (3rd Cir.1991), cert. denied, 502 U.S. 1066, 112 S.Ct. 956, 117 L.Ed.2d 124 (1992), plaintiff sued after he was denied promotion to full professor. The factors referred to by the court in its discussion of Bennun's qualifications for the position of full professor were the level and quality of his research and scholarly activity, his effectiveness as a teacher and his general usefulness to the university. Id. at 175. Assessment of such factors is inherently subjective, not objective. Nothing in the court's opinion, for instance, would indicate that a candidate for promotion to full professor had to have published a defined number of articles or obtained a set amount in grants in order to be considered qualified for promotion. Requiring a faculty member to demonstrate scholarly achievement and instructional ability is significantly different than requiring a candidate for dual rated shift manager to "have knowledge of all games," particularly when the disappointed candidate admits her failure to being knowledgeable as to "all games."
The plaintiff in Kunda v. Muhlenberg College, 621 F.2d 532 (3rd Cir.1980), was an instructor in the physical education department of the College. When her repeated requests for promotion to the position of assistant professor were denied and she was awarded a terminal contract, she filed suit, contending she was entitled to promotion and to tenure. The College had a written policy for promotion that required a Ph.D. or its "scholarly equivalent." Id. at 536. In plaintiff's field of physical education, a master's degree is the terminal degree. Ibid. The College had no written policy for tenure but there was testimony the two policies were substantially equivalent. Ibid. Kunda did not have a master's degree and was denied promotion. During the same period that her requests for promotion were denied, however, the College promoted three men in that department, each of whom lacked a master's degree. Id. at 538-39. Further, there was evidence that male candidates had been counseled about the requirement for a master's degree while Ms. Kunda was never afforded such advice and counseling. Plaintiff in this matter has been unable to marshal any comparable evidence.
For all the reasons stated, we affirm the summary judgment entered below.
*9 WECKER, J.A.D., concurring and dissenting.
This is an employment discrimination case involving a fifty-nine-year-old female casino employee who was not selected for promotion to a posted position in the casino. Plaintiff contends that defendant discriminated against her on account of her age and when she left her job, retaliated against her by refusing to rehire her, both actions in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to -49 ("LAD"). Defendant's motion for summary judgment was granted on both counts. I would affirm the judgment dismissing plaintiff's retaliation claim, but reverse the judgment dismissing her discrimination claim.

I
Plaintiff Evalyn "June" Pilkington's original complaint against defendant Bally's Park Place, Inc. ("Bally's") alleged age discrimination and constructive discharge in violation of the LAD. After years of pre-trial litigation on procedural issues, including Bally's unsuccessful attempt to disqualify plaintiff's counsel,[1] discovery was completed. Bally's moved for summary judgment for sanctions on the constructive discharge claim under the frivolous lawsuit statute. N.J.S.A. 2A:15-59.1. On leave granted by the Law Division, plaintiff filed an amended complaint alleging age discrimination and retaliation. Plaintiff's amended complaint did not allege constructive discharge.

II
Viewing the record in the light most favorable to plaintiff, as we must, see Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523, 666 A.2d 146, 147 (1995), the record supports these facts. Plaintiff was born on June 28, 1937 and was fifty-nine years old when she applied for a promotion at the casino. At the time, plaintiff had worked at Bally's as a pit manager for seventeen years, from 1979 to 1996, with duties that included supervising dealers and floor personnel in the gaming area known as a "pit." From 1961 to 1979, plaintiff had been a casino dealer in Reno, Nevada, dealing all major card games, except that in 1965 or 1966 she stopped dealing craps.
After joining Bally's, plaintiff became licensed in five games: blackjack, roulette, pow gai poker, baccarat, and mini-baccarat. She never became licensed in craps in New Jersey and did not supervise craps tables or deal craps as a pit manager. She admitted she would need a "refresher" course in craps in order to properly supervise that game.
Plaintiff's annual written Performance Appraisals for the years 1994, 1995, and 1996 reveal positive evaluations in virtually all of the twenty-one categories on Bally's appraisal form. Significantly, in light of the reasons proffered by Bally's for plaintiff's lack of qualification for the position she sought, plaintiff received the highest rating each year in the category of "knowledge""Displays exceptional knowledge in all phases of the position."
*10 In 1994, plaintiff received the highest rankings available in the categories of "development of associates," "procedures and regulations," "analysis," "delegation of authority," "communication," "judgment," "quality ... of work," "planning," "leadership," "follow-up," "accuracy," "personal appearance," "initiative," "cooperation," and "creativity." In the category of "development of associates," her supervisor added: "June consistantly [sic] counsels dealers and supervisors to achieve their highest potential." In the category of "communication," her supervisor added: "June communicates well with management in all phases of her job. Is very good at keeping management informed of possible problems before they become a problem." The same supervisor's general comment was: "We can always rely on June to do an exceptional job as a pit manager on a daily basis."
The only two categories in which plaintiff received less than the highest ranking in 1994 were in "courtesy," and "responsiveness to supervision," where she received the middle ranking.
In 1995, plaintiff received virtually the same evaluations as in 1994. In the category of "procedures and regulations," her supervisor added: "June has excellent knowledge of policy and is consistent in its enforcement." In the category of "communication," the supervisor's comment was "June keeps management aware of all information both gaming and employee related. She often assists in heading off problems before they escalate." Plaintiff's supervisor gave her the highest ranking on "courtesy""Consistently harmonious and responsive to the needs of others. Favorable influence on fellow employees." The overall comment of her supervisor was "June continues to take pride in her daily performance. She is consistent and reliable as a Pit Manager." The only category where plaintiff received the middle ranking was "responsiveness to supervision." Her supervisor's comment, consistent with 1994, was: "June can become averse toward supervision when her opinion differs with managements. [sic]"
Plaintiff's 1996 review demonstrates similar top rankings in virtually every category, including "responsiveness to supervision" and "courtesy."[2] Her supervisor added the following comments: "June strives to pass on her knowledge to her subordinates," and "June can be counted on in any situation to help achieve company goals." The supervisor noted one area as "requiring attention": "Retain your professionalism even when challenged by subordinates or management." However, the overall comment was "June's years of experience and knowledge have been a valuable asset to the company."
The appraisal form also provided a space for self-evaluation alongside the supervisor's evaluation in each category. Plaintiff's self-evaluations were almost entirely consistent with her supervisor's. In 1994, they disagreed only in the category of "courtesy." In 1995 and 1996, the only disparity between plaintiff's self-evaluation and that of her supervisor was in the category of "creativity," where plaintiff's supervisor rated her slightly below the highest level (where she placed herself).
On October 14, 1996, Bally's posted an Inter-Department Position Opening Notice for a position as a "Dual Rated Shift Manager," a position one rank above a pit manager. The Notice described the duties of the position:

*11 RESPONSIBLE FOR THE OPERATION AND SUPERVISION OF THE GAMING AREA FOR A SHIFT WHEN FUNCTIONING AS AN ASSISTANT SHIFT MANAGER AND FOR SUPERVISING THE OPERATION AND ACTIVITIES OF THE TABLE GAMES WHEN FUNCTIONING AS A PIT MANAGER.[[3]]
The Notice also stated that the requirements for the position included a "(key) shift manager" license as well as the following educational and experience criteria:
MUST DEMONSTRATE COMPLETION OF CASINO CONTROL COMMISSION REGULATIONS THROUGH KNOWLEDGE OF ALL GAMES. MUST HAVE KNOWLEDGE OF CASINO OPERATIONS, RULES, REGULATIONS, POLICIES AND PROCEDURES. KNOWLEDGE OF MANAGEMENT TECHNIQUES WHICH ENSURE PROPER MORALE AND EFFICIENCY.
Bally's contends that the "knowledge of all games" requirement could be fulfilled by obtaining a license in each game, or by attending gaming school, or by evidence of a set number of hours of experience dealing a particular game. Bally's admits that the Casino Control Commission since 1994 has left it to each casino to define the "knowledge" criterion. According to Bally's, knowledge of the game of craps required 180 hours of training and instruction.
Between 1994 and 1999 approximately five people were promoted from pit manager to shift manager without showing that they had all games listed on their license, but all of these individuals either had the required schooling or an affidavit in their personnel files showing that they had sufficient hours of experience dealing the games in which they were not licensed. In 1988, however, Samuel Rosetti was promoted to the position of shift manager without knowledge of all games. Rosetti, who had risen to the rank of a Casino Manager by 1996, testified that he did not have knowledge of either baccarat or roulette at the time he received his promotion to Dual Rated Shift Manager, but the position was held for him until he obtained those licenses.
Plaintiff applied for the posted position and was interviewed for the job. Plaintiff was one of twelve pit managers interviewed.[4] Rosetti conducted plaintiff's interview. During the interview, Rosetti noted plaintiff's statement that she had knowledge of all games. Shortly after the interview, Rosetti erased his note that plaintiff had knowledge of all games and replaced it with the statement:
June didn't touch much on rapport with subordinates. Could not recommend at this time. June didn't feel the position had any decision making power. No knowledge of craps.
Plaintiff testified that if she had known the requirement, and the alternative means to fulfill it, she could have obtained an affidavit attesting to her early experience as a craps dealer in Reno during the years she was employed there.
Also on the interview sheet were rankings for the interviewee's answers to each *12 question asked by the interviewer. Plaintiff's interview sheet shows that Rosetti considered most of her responses to be very good, and ranked her overall as "4" on a scale from one (lowest) to five (highest). However, Rosetti marked "No" to the question whether to promote.
A three-member committee was responsible for making the selection for the position: Casino Managers Rosetti and John Kayais ("Kayais") and Casino Vice President for Casino Operations, Kenneth Davie ("Davie"). Rosetti described his recollection of the committee's discussion as follows:
Q. Did Ken Davie have any opinion as to which woman should be promoted... ?
A. I believe Ken's choice was Nadine Vitrano.
Q. Was June Pilkington [plaintiff] discussed at all in that conference?
A. Yes.... Ken [Davie] didn't think we could promote [plaintiff] ... [b]ecause he didn't think that her interpersonal relationships would be good for morale on the floor.... He felt that there would be somebody else that would be more benign out on the floor.
Q. Benign [is] his word or 
A. He used that word a lot when it came to shift managers.... [S]omeone who was very easy-going, that was not threatening in their manner.
Plaintiff did not get the position, which went to Nadine Vitrano. At that time, Vitrano was forty years old, nineteen years younger than plaintiff. As of March 1995, Vitrano was licensed in all six gamescraps, baccarat, blackjack, roulette, poker, pow gai poker, and mini-baccarat. Vitrano was also licensed as a poker shift supervisor and as a key shift manager.[5] However, she had been subject to disciplinary action on four occasions between March 1995 and August 1996, and she was disciplined for a $10,000 oversight on November 8, 1996, approximately two weeks before the promotion decision was announced. In a deposition, a former Vice President for Casino Operations at Bally's, Rachel Bogatin, testified that Bally's had an unwritten policy that employees with written disciplinary notices would not be eligible for promotion for one year after the infraction.[6]
Vitrano's disciplinary record included these incidents: A "Pit Manager Incident/Counseling Report" dated March 10, 1995 relates a March 3, 1995 incident in which Vitrano "failed to make up a C.T.R. Report for a player who was in $11,100 in her pit .... [and that] failure to do so is in violation of the Federal Cash Reporting Laws." The report concludes: "Any further infractions of this nature could result in suspension or termination." A "Written Warning" dated December 30, 1995 relates a December 23, 1995 incident in which, after returning cards to the Security Department as required, Vitrano "failed to notice that a bag of cards from a previous shift had been left in the rear of the cabinet [thereby failing] to follow the Card Reconciliation Procedure." The warning concluded: "Future infractions of this nature could result in future disciplinary actions." An incident report dated August 25, 1996 noted Vitrano's failure that day "to log a Caribbean Stud Jackpot into the log book." Once again, the report concluded: "Future infractions of this nature may result in further disciplinary action." The *13 last "Written Warning" to Vitrano, dated November 8, 1996, relates that Vitrano "made a $10,000 error on a [craps] table closer" and again warns of "further disciplinary action" in the event of "[f]uture infractions of this nature." It is undisputed that plaintiff had a virtually unblemished disciplinary record.
On November 25, 1996, an announcement was posted stating that Vitrano had received the position. Plaintiff was so upset that she had been passed over for the position in favor of Vitrano, that she was not eating or drinking and became ill. Five days later, plaintiff left her position at Bally's without notice to her superiors. She did not return to work thereafter. Plaintiff testified that "the more time [she] had to think about it, the more miserable it made [her], thinking after all the years of really good service, that it wasn't appreciated." According to plaintiff's deposition testimony, when she learned that Vitrano had received the position she herself wanted, the first thing she thought was: "Boy, I want to sue them for it, because I just couldn't figure [it] out. I just knew I was a shoe-in for that job." Plaintiff became certain, through a process of elimination, that her age was the reason she was not promoted.
Just before she left her job at Bally's, plaintiff had conversations with two co-workers, Richard Moskowitz and Andrew Celle. Moskowitz's wife was an attorney, and plaintiff asked him if his wife could give her some advice about suing Bally's for not giving her the promotion. Moskowitz asked her to think about what she was doing, that she was giving up a good job that paid $70,000.00 a year, and he urged her not to leave, but she did.
Plaintiff also spoke to Celle before she left Bally's, because she knew that he had been represented by counsel in a discrimination action. She asked Celle for the name and telephone number of the attorney who had represented him. Celle gave plaintiff the information and plaintiff later contacted his attorney, who continues to represent her in this action.
A few days after leaving her job, plaintiff received a check for two weeks vacation pay. On December 3, 1996, Richard Tartaglio ("Tartaglio"), Bally's Assistant Vice President in charge of Labor and Employee Relations, sent the following letter to plaintiff:
Dear Ms. Pilkington [plaintiff]:
As you know, on Saturday, November 30, 1996 you abandoned your job. As such, this will be considered as your voluntary, unsolicited resignation from Bally's.
In this regard, your record will reflect resignation for personal reasons effective November 30, 1996, with rehire eligibility.
Plaintiff then reconsidered her situation and decided to see if Bally's would rehire her, based on Tartaglio's letter indicating "rehire eligibility." At her deposition, plaintiff testified:
I just assumed that maybe I was legally considered on vacation. I hadn't had any other notification from them at that time. Before the two weeks ran out, I called and asked to speak to Bernie DeLury [Bally's then Assistant Vice-President and Corporate Counsel], ... [a]nd I asked him if there was any chance that I could get a grievance hearing and maybe get my job back, and he said he would check into it and get back to me. He didn't call me back within like a week. I called him back. He didn't take the call.

* * *
In other words, I wanted to go in and explain to them why I walked out the *14 way I did, and to see if I could have my job back.
In her telephone conversation with DeLury, plaintiff cited her record as a reason for Bally's to grant her a grievance hearing and rehire her. Contrary to Bally's written policy with respect to voluntary resignations, no exit interview was ever arranged for plaintiff.
Plaintiff's certification in opposition to summary judgment includes a statement that to the best of her knowledge:
From approximately 1986 to November, 1996, Bally's neither promoted nor hired anyone over the age of 50 to the positions [of] Dual Rated Shift Manager, Shift Manager, Assistant Casino manager, Casino Manager, Vice President of Casino Operations or Chief Operating Officer.
In its response to plaintiff's interrogatory number 8 (requesting a list of all employees over the age of 50 who were promoted to the positions of pit manager, shift manager, dual rate shift manager, or dual rate pit manager), Bally's provided the names of five employees who received promotions on June 26, 1995, and who were all between the ages of 50 and 56 at the time of their promotion. However, Bally's response failed to identify the positions to which these employees were promoted. Plaintiff contends that none of the employees on Bally's list were promoted to a position above pit manager, and Bally's has not challenged that claim.

III
Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). In Brill the Supreme Court re-examined the application of the summary judgment rule:
We live in what is widely perceived as a time of great increase in litigation and one in which many meritless cases are filed, vastly increasing the dockets before our trial judges. As a result, the courts of this country have been urged to liberalize the standards so as to permit summary judgment in a larger number of cases.
[Brill, supra, 142 N.J. at 539, 666 A.2d at 156 (quoting Orme Sch. v. Reeves, 166 Ariz. 301, 802 P.2d 1000, 1003-04 (1990)).]
The Court held:
[W]hen deciding a motion for summary judgment under Rule 4:46-2, the determination whether there exists a genuine issue with respect to a material fact challenged requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.
[Id. at 523, 666 A.2d at 147.]
The Court nevertheless further stated:
The "judge's function is not himself [or herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." ... If there exists a single, unavoidable resolution of the alleged disputed issue of fact, that issue should be considered insufficient to constitute a "genuine" issue of material fact for purposes of Rule 4:46-2.... The import of our holding is that when the evidence "is so one-sided that one party must prevail as a matter of law," the *15 trial court should not hesitate to grant summary judgment.
[Id. at 540, 666 A.2d at 156 (alteration in original) (internal citations omitted).]
However, the Court also noted that "[i]t is critical that a trial court ruling on a summary judgment motion not `shut a deserving litigant from his [or her] trial.'" Id. at 540-41, 666 A.2d at 156 (alteration in original) (quoting Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 77, 110 A.2d 24, 29 (1954)). `"On the one hand is the desire to afford every litigant who has a bona fide cause of action ... the opportunity to fully expose his case.... On the other hand, protection is to be afforded against groundless claims and frivolous defenses.'" Id. at 541-42, 666 A.2d at 157 (quoting Robbins v. Jersey City, 23 N.J. 229, 240, 128 A.2d 673, 679 (1957)).
The same standards apply to the court reviewing a summary judgment. The appellate court owes no deference to the trial court's legal conclusions, but undertakes a de novo review of the record and the law. Pressler, Current N.J. Court Rules, comment 2.1 on R. 2:10-1 (2003).
The motion judge gave careful attention to plaintiff's arguments in this close case. Nevertheless, he granted summary judgment in favor of Bally's on the issue of age discrimination because he concluded that plaintiff was not qualified for the position she sought and thus failed to present a prima facie case of discrimination. He also concluded that she failed to establish a prima facie case of retaliation.
The essence of plaintiff's age discrimination claim is that Bally's promoted a significantly younger, no more qualified person over plaintiff and that its claims that plaintiff was not qualified for the position or that the person appointed was more qualified are pretextual. Plaintiff points to her own performance evaluations and to the fact that the successful candidate had a disciplinary record that should have disqualified her from promotion. Plaintiff also argues that Rosetti, who had lacked a license for two games, was promoted at a relatively young age to the same level position plaintiff later sought, and he was given an opportunity to complete the licenses he lacked. As additional circumstantial evidence that age was a factor in her case, plaintiff points to evidence that Bally's had not promoted anyone over the age of fifty to a position above pit manager between 1993 and 1999.

IV
The New Jersey Law Against Discrimination provides, in pertinent part:
It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:
a. For an employer, because of the... age, ... of any individual, ... to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.
[ N.J.S.A. 10:5-12.]
Plaintiff relies upon Greenberg v. Camden County Vocational and Technical Schs., 310 N.J.Super. 189, 708 A.2d 460 (App.Div.1998), to show that she has established a prima facie case of discrimination under LAD. The elements of a prima facie discrimination case based on failure to promote are adapted from the McDonnell Douglas framework.[7] A plaintiff has established the elements of a prima facie *16 case of discrimination if she has produced credible evidence that: (1) she is a member of a protected class under LAD; (2) she was qualified for the promotion she was seeking; (3) she was denied the promotion; and (4) the position was given to a significantly younger person who had similar or lesser qualifications. Greenberg, supra, 310 N.J.Super. at 198, 708 A.2d at 465. See also Pepe v. Rival Co., 85 F.Supp.2d 349, 365 (D.N.J.1999), aff'd, 254 F.3d 1078 (3d Cir.2001); Kelly v. Bally's Grand, Inc., 285 N.J.Super. 422, 429, 667 A.2d 355, 359 (App.Div.1995).
Evidence sufficient to establish a prima facie case need not persuade the court, when addressing a summary judgment motion, that it will preponderate at trial, but only that it is sufficiently credible that a reasonable factfinder could believe it. See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981) (recognizing that a plaintiff's burden in establishing a prima facie case "is not onerous.").
Once a plaintiff has established a prima facie case, an inference that the employment decision was made for unlawful, discriminatory reasons arises. Greenberg, supra, 310 N.J.Super. at 199, 708 A.2d at 465. At that point, the burden of producing evidence shifts to the defendant to "rebut the presumption of discrimination by either establishing the reasonableness of the otherwise discriminatory act or by articulating a legitimate, nondiscriminatory reason for the employment action." Ibid.
Finally, "[o]nce the employer sets forth a legitimate, nondiscriminatory reason for its adverse employment action, the burden again shifts to the employee to show that the employer's articulated reason `was merely a pretext to mask the discrimination' or was not the true motivating reason for the employment decision." Ibid., 708 A.2d at 466 (quoting Kelly, supra, 285 N.J.Super. at 430, 667 A.2d at 359). In other words, the presumption of a discriminatory motive drops out once the defendant produces evidence of a non-discriminatory reason for the challenged decision. The plaintiff can meet the ultimate burden of persuasion either by evidence that the employer was more likely motivated by the discriminatory reason than the lawful reason, or that the "employer's proffered explanation is unworthy of credence." Greenberg, supra, 310 N.J.Super. at 200, 708 A.2d at 466 (citation omitted).
In the instant action, the plaintiff unquestionably established three out of the four elements of her prima facie case. The issue was the second elementwhether she had presented sufficient evidence that she was qualified for the job. In most employment discrimination cases involving applications for promotion, the ultimate issue involves the employee's qualifications, either individually or by comparison with others. Thus where there is conflicting evidence respecting a plaintiff's qualifications, we must take great care not to deprive that plaintiff of the opportunity for a jury to weigh the evidence. Before we rely on a defendant's allegations of insufficient qualification to conclude that a plaintiff has not satisfied the second element of the prima facie case, we must be certain there is no genuine factual dispute on this material question.
In Greenberg, the trial court granted summary judgment in favor of the school board on the basis that the plaintiff had failed to show that she fulfilled the second element of a prima facie case of discrimination. Id. at 202, 708 A.2d at 467. We reversed, saying:
We are convinced that both defendant's claims of lack of qualification and the motion judge's comments thereon relate to the second step of the analysis once a

*17 prima facie case has been established, not the second prong of plaintiff's prima facie burden.
[Ibid. (Emphasis added).]
The open question in that case, as in the instant action, was whether the plaintiff produced sufficient evidence that she was qualified for the position. The school board stated that although Greenberg's educational background was clearly adequate, there were a sufficient number of deficiencies in her evaluations to justify denying her tenure. However, several of those who were granted tenure had a record of deficiencies similar to Greenberg's. Id. at 204, 708 A.2d at 468.
Here there is little question that plaintiff's knowledge of one gamecrapswas weak. However, given evidence that Rosetti had been granted the same promotion and allowed time to gain knowledge of two games in which he was not qualified, and that disciplinary infractions were overlooked for Vitrano, I cannot say that plaintiff failed to establish that she had the basic qualifications actually required by Bally's, sufficient to make a prima facie case.
The issue emphasized by Bally's in seeking summary judgment, and by the trial court in granting summary judgment, was that plaintiff was not qualified for the position because she was not licensed in craps and had no recent experience in the game. The motion judge adopted Bally's contention that plaintiff could not establish that she was qualified for the position, and therefore concluded that she did not present a prima facie case.
Plaintiff argues that even if there was a weakness in her credentials, it was not one that should have been fatal to her candidacy for promotion. In fact, Rosetti, the Casino Manager who interviewed plaintiff for the job, himself did not satisfy the "knowledge of all games" requirement when he was promoted in 1988, a year when the casino regulation still required licensure (not simply "knowledge") in all games. Plaintiff claims she was equally or better qualified than Vitrano, even if she needed a refresher course in craps to properly manage a craps table.
Vitrano, on the other hand, while having licenses that clearly fulfilled the "knowledge of all games" requirement, was promoted contrary to an unwritten Bally's policy alleged by plaintiff, that no employee who had any serious disciplinary infractions within the preceding year could be promoted above the level of pit manager.
Bally's gave no reason for enforcing one unwritten policy, the knowledge-of-all-games policy that allegedly barred plaintiff's advancement, and not the other, the no-disciplinary-infraction policy which would have barred Vitrano's promotion. Compared to Rosetti, who was missing credentials in both baccarat and roulette, and compared to Vitrano, who had five admittedly serious disciplinary infractions in less than two years, we cannot agree that plaintiff's limited experience in craps establishes that she was unqualified for the position.
Objective criteria are the proper considerations for determining qualification as the second element of a prima facie case. Greenberg, supra, 310 N.J.Super. at 203, 708 A. 2d at 467-68. But where there is evidence that the same or other objective criteria have been knowingly overlooked with respect to another candidate, summary judgment is not properly granted for failure to establish the second element. My disagreement with the majority is that I do not believe the law requires evidence of a pattern of inconsistency at the prima facie stage; one case where the purported job requirement was waived for another applicant is enough to demonstrate that it was not a genuine, objective measure of qualification for the position. In effect, that which appeared to be an objective *18 criterion for the position was subjectively applied.
Under these circumstances, the question of plaintiff's qualifications becomes inextricably intertwined with pretext and plaintiff's ultimate burden of proof. Once it appears that a defendant's contentions respecting prima facie qualification or lack thereof is disputed by some credible evidence, it is incumbent upon us to allow the case to go forward.
Indeed, a summary of plaintiff's evaluations, particularly in the areas of "knowledge," "development of associates," and "courtesy," supports the second element of plaintiff's prima facie case because it is credible evidence that plaintiff was "qualified" for the position for which she applied. Were the case to proceed as it should, these evaluations would also permit (although certainly not require) the inference that defendant's proffered reasons for not selecting plaintiff were pretextual.
If objective and not subjective job requirements are the relevant factors in determining an applicant's "qualification for the job" as the second element of a prima facie case, and if one of the seemingly objective requirements set forth in the written job description was waived for another applicant for the same position (Rosetti, eight years earlier), then that purportedly "objective" requirement has taken on a subjective element. The decision to maintain the requirement in this case, but to waive it in another, is a subjective decision best left to the next stage of the litigation, where credibility can properly be weighed. Under these circumstances, the requirement"knowledge of all cases"should no longer be treated as an "objective" job requirement, the absence of which precludes satisfaction of the prima facie case.
In my view, Greenberg remains strong support for Pilkington's prima facie case. As Judge Conley said in Greenberg,
We are convinced that both defendant's claims of lack of qualification and the motion judge's comments thereon relate to the second step of the analysis once a prima facie case has been established, not to the second prong of plaintiff's prima facie burden. To prove qualification under that second prong, a plaintiff may show either that she was performing her job at a level that met her employer's reasonable expectations or that her qualifications were similar to other tenure candidates.
[310 N.J.Super. at 202, 708 A.2d at 467.]
The majority holds that the Rosetti promotion in 1988 does not invite a closer look at the true qualifications for this promotion. In Dixon v. Rutgers, The State University of New Jersey, 110 N.J. 432, 541 A.2d 1046 (1988), in the context of a discovery dispute over peer review materials in a sex discrimination case, the Supreme Court rejected Rutgers' contention that the promotion packets of three other professors were not relevant, in part because "each was considered at a different time by the Board of Governors." Id. at 444, 541 A.2d at 1052. The Court found "the promotion packets of [the other two]... relevant in order for Dixon to establish her prima facie case, and to show that any countering explanations are mere pretext." Id. at 445, 541 A.2d at 1053 (emphasis added). Dixon is an example of the sometimes close connection between evidence sufficient to meet the second element of a prima facie case and evidence relevant to a plaintiff's ultimate burden of proving unlawful discrimination.
Two Third Circuit cases lend support to my view of the standard upon which to measure the sufficiency of evidence of objective qualification criteria to meet the second prima facie element. In each case, the defendant had disregarded a claimed *19 objective job requirement for one or more other persons.
In Kunda v. Muhlenberg College, 621 F.2d 532 (3d Cir.1980) (on appeal from judgment in plaintiff's favor after trial), the plaintiff was a physical education instructor who, after five years at the college, was denied both tenure and promotion to Associate Professor. The Third Circuit held that the district court was not clearly erroneous in finding the plaintiff qualified, even though she did not have the terminal degree which was one of three objective criteria for promotion listed in the Faculty Handbook. The evidence established that three other physical education teachers who also lacked the "required" terminal degree had been promoted during the nine years that plaintiff was employed in the department.
In Bennun v. Rutgers State Univ., 941 F.2d 154, 176 (3d Cir.1991), cert. denied, 502 U.S. 1066, 112 S.Ct. 956, 117 L.Ed.2d 124 (1992), the district court held that the plaintiff had been denied promotion to full professor on the prohibited basis of his ethnic background. Although judgment had been entered after a trial, the court chose to address the qualification element of the plaintiff's prima facie case. 941 F.2d at 173-76. The court compared the plaintiff's background on several objective criteria with those of a single candidate who had received promotion two years before, to conclude that Bennun "had met his burden of making out a prima facie case of discrimination." Ibid.
The employer's decision to waive the unwritten but objective no-disciplinary-infractions qualification for the successful candidate, Vitrano, adds to my sense that it was error to dismiss plaintiff's LAD complaint for lack of a prima facie case of age discrimination in the promotion decision.
In my view, plaintiff met the requirements of a prima facie case of unlawful age discrimination. I am convinced that a jury should decide whether plaintiff's qualifications or lack thereof were a pretext for age discrimination, and whether plaintiff's age was actually a motivating factor in Bally's decision to appoint another. I am equally convinced that plaintiff failed to establish a prima facie case of retaliation.
I therefore concur in part and dissent in part.
NOTES
[1] The record contains plaintiff's certification dated February 20, 2001, in which she stated she "had pitted craps for Bally's in January 1996." We do not consider that one, isolated incident to bear on the question.
[2] Rosetti had received several advancements after his 1988 promotion. At the time of this incident, he was a casino manager.
[3] Plaintiff's complaint originally contained a count alleging constructive discharge. Plaintiff voluntarily dropped that count and added the claim of retaliation.
[4] Bally's internal procedure for handling employee grievances is set forth in its Complaint Adjustment Review Board Procedure ("CARB").
[1] We previously ruled on plaintiff's interlocutory appeal from an order disqualifying Arlene Gilbert Groch, and remanded for an evidentiary hearing on defendant's claim that Ms. Groch had obtained confidential information in the course of representing another Bally's employee in a discrimination claim against Bally's. After an evidentiary hearing, the trial court denied disqualification. Thereafter, Bally's motion to seal the record of that hearing was initially granted; plaintiff's motion to unseal the record was then granted; and on Bally's interlocutory appeal, we again remanded for an evidentiary hearing. We subsequently affirmed an order sealing portions of the record.
[2] The photocopied 1996 evaluation form in plaintiff's appendix does not show three categories"quality," "planning," and "leadership"all categories in which she received the highest rankings in the previous two years.
[3] An October 31, 1995 revision of the job description lists the required license as "casino key employee." The required "EDUCATION/EXPERIENCE" is stated as:

Must demonstrate completion of Casino Control Commission regulations through knowledge of all games. Must have knowledge of all games. Must have knowledge of casino operations, techniques which ensure proper morale and efficiency.
[4] The record before us does not include the background of the others who applied or those who were interviewed.
[5] The record does not reflect whether plaintiff held these licenses, but Bally's has never alleged that plaintiff was "unqualified" for any reason other than "knowledge of craps."
[6] A written policy provided that an employee would be terminated, based on a "progressive point system," after a certain number of infractions.
[7] McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).