860 A.2d 945 (2004)
373 N.J. Super. 55
Leonard MANDEL and Susan Lewis, Plaintiffs-Appellants/Cross-Respondents, and
Robert O.B. Tonnesen and Greg Sanfilippo, Plaintiffs,
v.
UBS/PAINEWEBBER, INC., Jane Romany and Thomas Hayden, Defendants-Respondents/Cross-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued October 12, 2004.
Decided November 12, 2004.
*949 Michael J. Reimer, South Orange, argued the cause for appellants/cross-respondents (Reimer & Niedweske, attorneys; Mr. Reimer and Lori Lewis, on the brief).
Francis X. Dee, Morristown, argued the cause for respondent/ cross-appellant Thomas Hayden (McElroy Deutsch Mulvaney & Carpenter, attorneys; Mr. Dee, of counsel; Mr. Dee and Thomas C. Bigosinski, on the brief).
Gregory T. Alvarez, Morristown, argued the cause for respondents/cross-appellants UBS/PaineWebber and Jane Romany (Jackson Lewis, attorneys; Vincent A. Cino and Gregory T. Alvarez, of counsel; Mr. Alvarez and Cara R. Weinrich, on the brief).
Before Judges PETRELLA, LINTNER and PARKER.
The opinion of the court was delivered by
PARKER, J.A.D.
Plaintiffs, Leonard Mandel and Susan Lewis, filed a complaint against their former employer, UBS/PaineWebber, Inc., (PW) and two of its employees, Jane Romany and Thomas Hayden, alleging, among other things, constructive discharge, disparate treatment and hostile work environment due to religious and gender discrimination in violation of the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42; tortious interference with their prospective business relationships with their clients; third-party sexual harassment; and negligent retention of Romany. Plaintiffs are appealing from a grant of summary judgment dismissing their complaint in its entirety. We affirm.
Plaintiffs were employed at PW's Morristown office. Lewis was hired as a broker in 1993 and Mandel was hired as a bond broker in 1994. Defendant Hayden was the Branch Manager and defendant Romany was the Branch Operations or Administrative Manager of the Morristown office. Hayden was Romany's direct supervisor. Romany was responsible for handling client complaints and agency inquiries, as well as providing liaison and fact-gathering support for litigation matters. She was also responsible for contacting clients regarding their accounts, especially if those accounts were listed on PW's "Monthly Active Account Review."
Hayden, as branch manager, was responsible for the daily review of trading in the accounts at the Morristown office. PW's Trade Monitor Manual authorized Hayden to delegate some of the necessary steps in reviewing the accounts to the branch management team, and he specifically designated Romany to contact clients of all the brokers in the Morristown office. She made approximately thirty calls per month to clients. Many of the brokers routinely complained to Hayden when Romany called their clients because the brokers were concerned that the calls gave their clients the impression that something was wrong with their accounts.
Pursuant to PW policy, when Lewis was hired, she received a $180,000 inducement and a "forgivable loan" of $142,000. It was *950 PW's policy to forgive the loan if the broker remained employed for four years. When Mandel was hired, he received a "forgivable loan" of $234,000. Notwithstanding their complaints of discrimination, tortious interference and third-party sexual harassment, both plaintiffs remained at PW for more than four years and their loans were forgiven. Lewis voluntarily left her employment with PW in August 1998, and immediately found a new job. Mandel resigned in June 1998, rather than be terminated by the company, and he, too, found a new job immediately.
The gravamen of plaintiffs' complaint is that their income dropped each year they were employed at PW. They alleged "upon information and belief" that Hayden and Romany were "engaged in a close, intimate personal relationship."[1] Lewis blamed Romany for the decrease in her income, claiming that Hayden found her attractive and that Romany was jealous, leading Romany to call Lewis's clients and undermine Lewis's accounts. Mandel claimed that his income declined each year he was employed at PW because of Romany's interference, as well. Both plaintiffs maintained that Romany did not like them because they were Jewish.
Throughout the litigation, plaintiffs maintained that Hayden and Romany were having an affair and that plaintiffs purportedly suffered from third-party sexual harassment by Romany as a result of her intimate relationship with Hayden. Indeed, plaintiffs continued to insist that Hayden and Romany were having an affair despite the fact that there was no factual basis for the allegation. Rather, plaintiffs relied on "perception" and office gossip in their attempt to create a basis for their claims.[2]
Lewis made numerous allegations against Romany that were based on Lewis's "feelings." Among the allegations for which there was no factual basis was Lewis's claim that Romany was "possibly" impersonating her, making appointments at beauty salons, nail salons or electrolysis offices in Lewis's name, and those establishments called Lewis to confirm these phantom appointments. Lewis further alleged that during her employment, items were stolen from her office, including jewelry, nail polish, paperwork, a mortgage payout and a diamond earring. Lewis "suspected" Romany of stealing her things, but admitted that she had no evidence whatsoever to support those suspicions.
Lewis acknowledged that it was Romany's job to contact clients regarding their accounts, but nevertheless alleged that Romany intended to poison Lewis's client relationships, causing Lewis's income to drop. Lewis submitted the testimony of four clients who received calls from Romany, none of whom indicated that Romany attempted to "poison" their relationship with Lewis. Lewis further acknowledged that she and Romany often had cordial and personal conversations and that she could not remember any Jewish discrimination issues that arose during their conversations. Indeed, during her deposition, Lewis stated that "for me the issue was more of a hatred for being a woman more so than being Jewish." She complained to *951 Hayden about Romany's not liking her, but claimed that Hayden never did anything in response to her complaints. She also complained to Human Resources because she was "distressed" that Romany had referred to her as a "cancer," but, again, made no complaint of religious or gender-based discrimination. Lewis claimed that Human Resources did nothing about her complaints either and that when Hayden found out she had gone to Human Resources, he came to Romany's defense.
Lewis further alleged that Romany maintained an "A-list" and a "B-list" of brokers in the office; the "B-list" was comprised of the less favored brokers. Lewis admitted that the majority of brokers on Romany's B-list were not Jewish, but were of various religious and ethnic backgrounds. She nevertheless alleged that the lists were maintained to target Jewish brokers for unfair treatment.
Mandel also claimed that Romany targeted him because he was Jewish. He nonetheless acknowledged that many Jewish brokers worked with Romany and were very successful. Mandel maintained, however, that he was "very, very much involved in [his] religion."
Mandel's complaints focused on his relationship with PW's municipal bond desk (bond desk). On his first day of employment in the Morristown office, he engaged in a shouting match with Nancy Hawkins, the supervisor of the municipal bond desk, over office policies. While he accused Romany of coming between him and the bond desk from his first day of employment, he admitted in his deposition that it was unlikely that Romany had influenced the bond desk at that point.
Mandel's problems with the bond desk continued throughout his employment and he claimed that Romany interfered with every transaction between him and the bond desk. Hawkins, however, routinely complained to Hayden about Mandel's abusive office behavior and his practice of "flipping," which was inconsistent with PW policy.[3] Mandel was cited three times in 1994 for improperly entering "block orders" with the bond desk. That is, Mandel failed to follow the PW policy requiring that "all employee and employee related orders be segregated and fully disclosed as being employee or employee related at the time the order is entered." Mandel was cited for the same violation again in March 1995. Notwithstanding his repeated violations of PW policy, Mandel accused Romany of influencing the bond desk not to give him favorable prices. Despite his persistent allegations, at his deposition, Mandel admitted that he had no evidence to support his claim that Romany interfered with his relationship with the bond desk.
Moreover, Mandel's behavior to and about Romany was demeaning and sexist. For example, he admitted calling her a "bitch" when he was talking to other brokers in the office; and he acknowledged that he cursed in the office and called Romany "a cunt" when speaking to the other brokers. He conceded that his offensive language was against PW's Code of Conduct and that he could have been immediately terminated for it.
In February 1997, Mandel was suspended from dealing with the bond desk for ninety days because he had contacted dealers in California regarding bond offerings without first seeking permission. He acknowledged that Romany had nothing to do with his suspension. Moreover, during *952 his suspension, Romany made many calls to the bond desk on his behalf. Mandel complained to Hayden about his suspension and his problems with the bond desk but did not refer to any problems with Romany, nor did Mandel mention that he was being discriminated against because of his religion. Mandel also complained to divisional management that Hawkins and the bond desk did not like him or his methods, but never mentioned Romany or religious discrimination.
In 1998, the bond desk again refused to do business with Mandel. Hawkins, the bond desk supervisor, complained about Mandel to PW's Regional Manager, Barry Buchsbaum, who is Jewish. Buchsbaum decided to terminate Mandel, but Hayden persuaded him to permit Mandel to resign instead to make it easier for Mandel to get another job. In June 1998, Mandel resigned from PW and began working with A.G. Edwards & Sons, Inc., the same month.
Plaintiffs retained Jerome A. Chanes as an expert in anti-Semitism. Chanes is an adjunct professor of sociology at Barnard College, an author of numerous published texts and articles, and active in the Jewish community. In his report, Chanes recites as the factual basis for his opinion, plaintiffs' hearsay assertions of two remarks purportedly made by Romany. One of the "Jewish" comments ascribed to Romany related to the office fantasy football league when Romany allegedly said, "This is the gentiles against the Jews and the plaque should never hang in anybody's office that doesn't celebrate Christmas." Neither Mandel nor Lewis were present when that remark was reportedly made and neither heard about it until after they left their employment at PW. Romany also was alleged to have referred to Lewis as "something like a Jew bitch" to another woman in the office. Again, Lewis was not present when the remark was purportedly made and did not learn of it until after she left PW.
Chanes's report presents a lengthy dissertation on anti-Semitism and concludes:
In my opinion, the behavior of defendant Jane Romany constituted discrete and explicit expressions of antisemitism, which, coupled with other abusive acts  themselves linked to, indeed of a piece with, antisemitic expression  constituted damage, including loss of income, to the plaintiffs Leonard Mandel and Susan Lewis. Whilst the overall incidence of antisemitism in the American workplace is low, consistent with data on the general state of Jewish security in America, instances of antisemitic expression in the workplace, especially in "corporate America," do exist (possibly to a greater extent than the formal data show) and those instances, when refracted through the prism of the overall security of America's Jews, are unusually traumatic and damaging.
Moreover, Chanes dismissed plaintiffs' behaviors, particularly Mandel's conduct, stating:
To suggest that it was the behavior of the plaintiffs that resulted in damage to them and to their loss of income may be in some extremely-narrow, highly-literal, and very-limited sense true; but this would be a sorry and sad example of "blaming the victim." I would suggest that this approach is violative of psychological and sociological theory and practice, of professional ethics, and of common sense.
Plaintiffs also submitted an expert report prepared by Brad Palmer, a certified public accountant, to support their damages claims. Palmer analyzed plaintiffs' income from 1991 through their employment at PW to their subsequent employment. He concluded that Lewis lost $2.1 *953 million and Mandel lost $2.35 million while employed at PW.
Against this factual background defendants moved for a summary judgment. The motion was granted and plaintiffs appealed, arguing that (1) N.J.R.E. 704 permits an expert to provide an opinion which embraces the ultimate issues to be decided by the trier of fact; (2) summary judgment should not have been granted where there were disputed material issues of fact; (3) the evidence supported plaintiffs' claims that they were treated in a disparate and hostile manner because of their religion; (4) plaintiffs were subjected to third-party sexual harassment as a result of the "close, intimate personal relationship" between Hayden and Romany; (5) Lewis has stated a colorable claim of gender discrimination under the LAD; (6) Romany and Hayden tortiously interfered with plaintiffs' business relationships with their clients; (7) plaintiffs have stated valid claims against Romany and Hayden under the LAD; and (8) PW negligently retained Romany. We find no merit in these arguments.

I
Plaintiffs contend that the motion judge erred in granting summary judgment on their claims for hostile work environment and disparate treatment.
In assessing discrimination claims under the LAD, we employ a three-step, burden-shifting analysis developed under the federal anti-discrimination laws. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 677 (1973); Peper v. Princeton Univ. Bd. of Trs., 77 N.J. 55, 81-82, 389 A.2d 465 (1978). Under that approach:
(1) the plaintiff must come forward with sufficient evidence to constitute a prima facie case of discrimination; (2) the defendant then must show a legitimate non-discriminatory reason for its decision; and (3) the plaintiff must then be given the opportunity to show that defendant's stated reason was merely a pretext or discriminatory in its application.
[Dixon v. Rutgers, The State Univ. of N.J., 110 N.J. 432, 442, 541 A.2d 1046 (1988) (citing Peper, supra, 77 N.J. at 82-83, 389 A.2d 465; McDonnell Douglas, supra, 411 U.S. at 807, 93 S.Ct. at 1826, 36 L.Ed.2d at 680).]
When there is no direct evidence of discrimination, the plaintiff-employee must first prove by a preponderance of the evidence the four elements of a prima facie case. McDonnell Douglas, supra, 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677. See Bergen Commercial Bank v. Sisler, 157 N.J. 188, 209, 723 A.2d 944 (1999) (holding that cases relying on circumstantial evidence should use the burden-shifting methodology of McDonnell Douglas). The general structure of a prima facie case under McDonnell Douglas requires a plaintiff to prove:
(1) that he or she is a member of a protected class; (2) that he or she was qualified for the job; (3) that he or she was negatively affected by the defendant's employment decisions; and (4) that he or she was treated less favorably than employees not within the protected class.
[Murphy v. Hous. Auth. & Urban Redevelopment Agency of Atlantic City, 32 F.Supp.2d 753, 763 (D.N.J.1999), aff'd, 208 F.3d 206 (3d Cir.2000).]
If a plaintiff establishes a prima facie case, it creates a presumption of discrimination, and the burden shifts to the employer to produce evidence of a legitimate, non-discriminatory reason for its actions against plaintiff. Mogull v. CB Commercial Real Estate Group, Inc., 162 N.J. 449, *954 462, 744 A.2d 1186 (2000); Sisler, supra, 157 N.J. at 210-11, 723 A.2d 944. Once the employer produces evidence of a legitimate reason for its actions, the presumption of discrimination disappears, and the burden then shifts back to the plaintiff to prove that the employer's reasons were a pretext for discrimination, i.e., they were false, and the real reason was discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515, 113 S.Ct. 2742, 2751-52, 125 L.Ed.2d 407, 422 (1993); Mogull, supra, 162 N.J. at 462, 744 A.2d 1186; Sisler, supra, 157 N.J. at 211, 723 A.2d 944. The ultimate burden of proof always remains with the plaintiff. St. Mary's, supra, 509 U.S. at 518, 113 S.Ct. at 2753, 125 L.Ed.2d at 423; Sisler, supra, 157 N.J. at 211, 723 A.2d 944.
Plaintiffs contend that the motion judge ignored their expert's report and dismissed its critical value. They argue that Chanes's report embraced the ultimate issue of fact and was therefore admissible under N.J.R.E. 704. They maintain, moreover, that given the quantity and quality of Chanes's unrebutted opinions regarding Romany's behavior, the judge erred by granting summary judgment in favor of defendants.
We disagree with plaintiffs' assertion that an unrebutted expert opinion is admissible per se simply because it addresses the ultimate issue of fact. The trier of fact has no duty to give controlling effect to uncontradicted expert testimony and it need not accord the expert testimony greater weight than other evidence. Waterson v. Gen. Motors Corp., 111 N.J. 238, 248, 544 A.2d 357 (1988). Expert testimony should be weighed and judged as any other testimony and may be totally disregarded. Ibid.
The standard on summary judgment, however, is not to weigh the credibility or preponderance of the evidence. Tomeo v. Thomas Whitesell Constr. Co., 176 N.J. 366, 370, 823 A.2d 769 (2003). Rather, in determining a motion for summary judgment, the judge must decide whether "the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational fact/finder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). "If there exists a single, unavoidable resolution of the alleged disputed issue of fact, that issue should be considered insufficient to constitute a `genuine' issue of material fact for purposes of Rule 4:46-2.... [W]hen the evidence `is so one-sided that one party must prevail as a matter of law,' the trial court should not hesitate to grant summary judgment." Brill, supra, 142 N.J. at 540, 666 A.2d 146 (citation omitted). On appeal, we apply the same standard. Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div.1998).
An expert's opinion cannot provide the factual basis for denying summary judgment. See Todd v. Sheridan, 268 N.J.Super. 387, 401, 633 A.2d 1009 (App.Div.1993). Indeed, an expert's opinion is rendered a "net opinion" if it is based on unfounded facts. Brach, Eichler, P.C. v. Ezekwo, 345 N.J.Super. 1, 11, 783 A.2d 246 (App.Div.2001). Chanes's report is grounded on plaintiffs' essentially unsupported allegations. The only anti-Semitic *955 allegations are (1) Romany's purported remark during the office fantasy football league: "This is the gentiles against the Jews and the plaque should never hang in anybody's office who doesn't celebrate Christmas;" and (2) Romany's purported reference to Lewis as "something like a Jew bitch," to another employee. Neither of the plaintiffs heard these remarks or were even aware of them until after they left PW. None of the other allegations against Romany, including her alleged affair with Hayden, are supported by anything more than plaintiffs' suspicions and office gossip. Moreover, Chanes ignores Mandel's conduct and states that taking Mandel's conduct into consideration is tantamount to "blaming the victim." Taken to its logical conclusion, in Chanes's opinion no employee in a protected category under the LAD could be reprimanded, disciplined or terminated by an employer, regardless of how offensive that employee's conduct may be, because that would be "blaming the victim." Obviously, this is not the intent of the LAD.
Chanes's opinion, which is based upon unsupported allegations, lacks the necessary foundation and is a "net opinion." See, e.g., Brach, Eichler, supra, 345 N.J.Super. at 11, 783 A.2d 246; Gore v. Otis Elevator Co., 335 N.J.Super. 296, 303-04, 762 A.2d 292 (App.Div.2000); Grzanka v. Pfeifer, 301 N.J.Super. 563, 579-83, 694 A.2d 295 (App.Div.1997), certif. denied, 154 N.J. 607, 713 A.2d 498 (1998).
The two "Jewish" remarks purportedly made by Romany, even if accepted as true for purposes of a Brill analysis, do not rise to the level of the severe and pervasive conduct required to establish a cause of action for hostile work environment under the LAD. Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 604, 626 A.2d 445 (1993).
[A] hostile work environment discrimination claim cannot be established by epithets or comments which are `merely offensive.' An employment discrimination law such as the LAD is not intended to be "a `general civility' code" for conduct in the workplace.... "[D]iscourtesy or rudeness should not be confused with racial [or ethnic] harassment," and "a lack of racial [or ethnic] sensitivity does not, alone, amount to actionable harassment." Thus, "simple teasing," offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the "terms and conditions of employment."
[Heitzman v. Monmouth County, 321 N.J.Super. 133, 147, 728 A.2d 297 (App.Div.1999) (alterations in original); (citations omitted).]
In reviewing a claim for hostile work environment, we consider the totality of the circumstances. Lehmann, supra, 132 N.J. at 607, 626 A.2d 445. The complained of conduct must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Id. at 608, 626 A.2d 445.
In Heitzman, the plaintiff alleged an anti-Semitic hostile work environment based on
inquiries about what he was doing on Friday nights and his dietary habits, the reference to plaintiff's vacation destination as the "Jewish Alps," the comment about the country club which excluded non-Jews, and the characterization of Yarmulkes as "skullcaps," ... [and h]is supervisor Dodig's characterization of his own girlfriend as a "Jew bitch" and his comment about a "Jewish mile."
[Heitzman, supra, 321 N.J.Super. at 148, 728 A.2d 297.]
See also, Lehmann, supra, 132 N.J. at 606, 626 A.2d 445 (stating that "it is the harassing *956 conduct that must be severe or pervasive, not its effect on the plaintiff or on the work environment."); Herman v. Coastal Corp., 348 N.J.Super. 1, 22, 791 A.2d 238 (App.Div.), certif. denied, 174 N.J. 363, 807 A.2d 195 (2002) (stating that "[m]ere insults in the workplace are not the equivalent of discrimination.") The cited cases are distinguished from those in which specific ethnic slurs were deemed sufficiently offensive to create a hostile work environment when uttered by a supervisor directly to a subordinate. See, e.g., Taylor v. Metzger, 152 N.J. 490, 502-03, 706 A.2d 685 (1998) (holding that one patently racist slur spoken publicly by a supervisor to a subordinate created a jury question on whether the comment was sufficiently severe); Flizack v. Good News Home For Women, Inc., 346 N.J.Super. 150, 156, 159-60, 787 A.2d 228 (App.Div.2001) (holding that an African-American female supervisor's single incident toward a white female employee, which included a comment that if the employee was still angry with her, the supervisor was going to have to stare into the employee's big blue eyes and pat those "white titties," was sufficient as to support claim of racial discrimination and sexual harassment); Leonard v. Metro. Life Ins. Co., 318 N.J.Super. 337, 345, 723 A.2d 1007 (App.Div.1999) (holding that comments about a subordinate's disability uttered by a supervisor directly to the subordinate created a genuine issue of material fact on the severe or pervasive requirement); Woods-Pirozzi v. Nabisco Foods, 290 N.J.Super. 252, 270-71, 675 A.2d 684 (App.Div.1996) (holding that a jury question existed on the severe or pervasive requirement when the subordinate alleged that her supervisor "frequently" made derogatory comments to her because of her gender).
In our view, the hostile work environment claims were properly dismissed because, even considering the facts in a light most favorable to plaintiffs, a jury could not conclude that Romany's comments and actions were so severe or pervasive to create a hostile work environment.
Similarly, plaintiffs have not demonstrated a prima facie case of disparate treatment. Disparate treatment is demonstrated when a member of "a protected group is shown to have been singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion" under the anti-discrimination laws. EEOC v. Metal Serv. Co., 892 F.2d 341, 347 (3d Cir.1990). "The burden of establishing a prima facie case of disparate treatment is not onerous"; the function of the prima facie case is to eliminate "the most common nondiscriminatory reasons for the plaintiff's rejection." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-54, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207, 215-16 (1981). That is, "[t]he initial burden of showing a prima facie case is met when the plaintiff shows that `it is more likely than not' that the employer's actions were based on unlawful considerations." Dixon, supra, 110 N.J. at 443, 541 A.2d 1046 (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957, 967 (1978)).
The same burden shifting methodology is employed for disparate treatment claims as for hostile work environment. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir.1994). On a motion for summary judgment, the judge must determine whether a plaintiff alleging disparate treatment has produced sufficient evidence to rebut the employer's alleged legitimate reason for its adverse action. Id. at 764. The plaintiff may defeat the motion "by either (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than *957 not a motivating or determinative cause of the adverse employment action." Ibid.
The non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," Ezold [v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir.1992), cert. denied, 510 U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993)], and hence infer "that the employer did not act for [the asserted] nondiscriminatory reasons." Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir.1993).
[Fuentes, supra, 32 F.3d at 765 (alteration in original); (other citations omitted); (footnote omitted).]
We have adopted and applied the Fuentes standard in reviewing a grant of summary judgment in disparate treatment cases under the LAD. See, e.g., Kolb v. Burns, 320 N.J.Super. 467, 479-83, 727 A.2d 525 (App.Div.1999) (holding that a teacher who alleged the superintendent of schools retaliated against her for testifying in favor of a handicapped student regarding his placement had presented sufficient evidence to rebut defendants' proffered reasons to overcome summary judgment); Greenberg v. Camden County Vocational & Technical Schs., 310 N.J.Super. 189, 207, 708 A.2d 460 (App.Div.1998) (holding that a teacher who alleged age and gender discrimination in denial of tenure had sufficiently rebutted defendant's proffered reasons to overcome a motion for summary judgment); and Romano v. Brown & Williamson Tobacco Corp., 284 N.J.Super. 543, 554, 665 A.2d 1139 (App.Div.1995) (holding that an employee who alleged retaliatory discharge for testifying on behalf of a co-employee in her sexual harassment case "established enough of an inference that defendant's proffered reason was not the actual motivating reason behind its actions" to defeat a motion for summary judgment).
Here, plaintiffs contend that they established a prima facie case because they were qualified for their positions and they are Jewish. Nevertheless, there is simply no evidence of discriminatory animus to support plaintiffs' assertions of disparate treatment. A plaintiff must "demonstrate that the employer was motivated by discriminatory intent." Viscik v. Fowler Equip. Co., 173 N.J. 1, 14, 800 A.2d 826 (2002).
First, there is no evidence that Romany treated Jewish brokers less favorably than the other brokers. Most of the people on her "B-list" were not Jewish, and most of the top brokers in the office were Jewish.
Second, Lewis presented no evidence to show that Romany singled her out because she was Jewish. PW's manuals show that Romany, as Branch Administrative Manager, was responsible for calling Lewis's clients. Moreover, none of Lewis's clients testified that Romany made any discriminatory statements, nor did any of Lewis's clients refuse to use Lewis as a broker after Romany's calls. Similarly, Lewis presented no evidence to show that Romany instigated the calls to Lewis from beauty or nail salons.
Third, Mandel cannot show that Romany interfered in his relationship with the bond desk. Mandel admitted that he had engaged in a shouting match with the bond desk supervisor on the very first day of his employment and that the bond desk eventually refused to deal with him due to his conduct. He has not cited a single instance in which Romany interfered with his relationship with the bond desk.
Fourth, and most important, there is no evidence  other than plaintiffs' *958 expert's opinion  that the decrease in plaintiffs' income was due to any disparate discriminatory treatment by Romany. Damages alone cannot constitute a prima facie case of disparate treatment. See Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 41 n. 1, 477 A.2d 1224 (1984).
We, therefore, affirm dismissal of plaintiffs' claims of disparate treatment based on religious discrimination.

II
Plaintiffs contend that the judge erred in dismissing their cause of action for third-party sexual harassment. Plaintiffs based this claim on their allegation that Hayden and Romany were "engaged in a close, intimate personal relationship." Despite the fact that this case was pending for two and one-half years before summary judgment was granted, plaintiffs never presented one iota of evidence to support that allegation beyond office gossip and "perception." Indeed, at oral argument before the motion judge, plaintiffs' counsel finally admitted that the allegation was "speculation." Nevertheless, plaintiffs have persisted in the claim through this appeal and now argue that they "were denied discovery on the issue" because subpoenas for Hayden's and Romany's personnel records from their prior employers were quashed. Plaintiffs have not appealed the orders quashing those subpoenas, however, and we will consider the record before us which is devoid of evidence supporting an "intimate" or sexual relationship between Hayden and Romany. See Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973).
To sustain a claim for third-party sexual harassment, a plaintiff must establish that: (1) employment opportunities or benefits were bestowed upon a third party due to that third party's "submission" to the employer's coercive sexual advances; and (2) the plaintiff was qualified for but was denied the same opportunities or benefits bestowed on the third party because of the coerced sexual harassment. Erickson v. Marsh & McLennan Co., 117 N.J. 539, 557, 569 A.2d 793 (1990). An adverse employment action allegedly resulting from a consensual, non-coercive relationship between the employer and the third party, is insufficient to establish a claim of third-party sexual harassment. Ibid. Moreover,
A sexual relationship between a supervisor and a co-employee could adversely affect the workplace without creating a hostile sexual environment. A supervisor could show favoritism that, although unfair and unprofessional, would not necessarily instill the workplace with oppressive sexual accentuation. The boss could treat everyone but his or her paramour badly and all of the subordinates, save the paramour, might be affected in the same way. Erickson clearly states that this kind of situation does not create a claim for sexual harassment.
[Drinkwater v. Union Carbide Corp., 904 F.2d 853, 862 (3d Cir.1990).]
Even the Equal Employment Opportunity Commission (EEOC) has adopted the position that Title VII of the Civil Rights Act of 1964 does not prohibit isolated instances of preferential treatment based upon consensual romantic relationships:
Not all types of sexual favoritism violate Title VII. It is the Commission's position that Title VII does not prohibit isolated instances of preferential treatment based upon consensual romantic relationships. An isolated instance of favoritism toward a "paramour" (or a spouse, or a friend) may be unfair, but it does not discriminate against women or men in violation of Title VII, since both *959 are disadvantaged for reasons other than their genders. A female [plaintiff] who is denied an employment benefit because of such sexual favoritism would not have been treated more favorably had she been a man nor, conversely, was she treated less favorably because she was a woman.
[EEOC Policy Guidance on Employer Liability under Title VII for Sexual Favoritism, EEOC Notice No. 915-048, at 2 (Jan. 12, 1990), as cited in Harvey v. Chevron U.S.A., Inc., 961 F.Supp. 1017, 1030 (S.D.Tex.1997).]
Plaintiffs' third-party allegation of sexual harassment requires proof of a coerced sexual relationship between Hayden and Romany. Plaintiffs failed to demonstrate any sexual relationship, let alone a coerced sexual relationship. Accordingly, the dismissal of plaintiffs' third-party sexual harassment claims is affirmed.

III
Lewis contends that the judge erred in dismissing her cause of action for gender discrimination. Again, Lewis failed to present any factual evidence to support her allegations and "suspicions."
Once again, during oral argument before the motion judge, plaintiffs' counsel acknowledged, "We don't have actual evidence of this other than ... [Lewis's] speculation...." Lewis now argues that Hayden made comments about her legs, and that his complimentary comments compounded the hostility that Romany had toward her. Lewis maintains that the "perception" that Hayden and Romany were having an affair somehow supports her claim that Romany was hostile towards other women, particularly her. "Perception" like "speculation" and "suspicion" cannot support a cause of action. Viewing the evidence in a light favorable to Lewis, the record contains no evidence that any harassment by Romany was based on gender. The dismissal of her gender discrimination claim is affirmed.

IV
Plaintiffs next contend that the judge erred in dismissing their claims for tortious interference with their prospective business relationships with their clients. The motion judge found that plaintiffs failed to identify even a single client with whom defendants had interfered and concluded that there was "nothing other than pure speculation as to ... the cause... for their loss in income."
"There is no question that New Jersey law protects both contracts and prospective business relationships from tortious interference." Van Natta Mech. Corp. v. Di Staulo, 277 N.J.Super. 175, 182, 649 A.2d 399 (App.Div.1994). To establish that cause of action plaintiffs must demonstrate that (1) they had some reasonable expectation of economic advantage; (2) the defendants' actions were malicious in the sense that the harm was inflicted intentionally and without justification or excuse; (3) the interference caused the loss of the prospective gain or there was a reasonable probability that the plaintiff would have obtained the anticipated economic benefit, and (4) the injury caused the plaintiff damage. Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 751-52, 563 A.2d 31 (1989).
"[I]t is `fundamental' to a cause of action for tortious interference with a prospective economic relationship that the claim be directed against defendants who are not parties to the relationship." Printing Mart, supra, 116 N.J. at 752, 563 A.2d 31; See Van Natta, supra, 277 N.J.Super. at 182, 649 A.2d 399; Silvestre v. Bell Atl. Corp., 973 F.Supp. 475, 486 (D.N.J.1997) (holding that "[a] tortious interference *960 with contract claim can be waged only against a third-party who is not a party to the contractual or economic relationship at issue."), aff'd, 156 F.3d 1225 (3d Cir.1998).
Plaintiffs argue that PW's clients essentially contract only with their particular brokers and not with the financial services corporation or trading firm. They have produced no evidence to support that claim, however. Indeed, the evidence demonstrates that plaintiffs were PW employees and their clients were PW's clients: plaintiffs were compensated by PW, PW paid them commissions on sales for their clients' accounts, PW extended "forgivable loans" to plaintiffs, and PW supervised their accounts, their trading practices and conduct. Moreover, plaintiffs have specifically alleged that they were PW employees and that Hayden and Romany were their supervisors.
Inasmuch as plaintiffs and defendants were, at all times, parties to the corporate relationship between PW and its clients, plaintiffs cannot maintain an action for tortious interference against defendants. "One cannot interfere with one's own economic relationship, since in such an instance the matter is governed by principles of contract law." Van Natta, supra, 277 N.J.Super. at 182, 649 A.2d 399. Accord Sandler v. Lawn-A-Mat Chem. & Equip. Corp., 141 N.J.Super. 437, 450, 358 A.2d 805 (App.Div.), certif. denied, 71 N.J. 503, 366 A.2d 658 (1976).
Notwithstanding plaintiffs' inability to maintain a cause of action against defendants because of the employee/employer relationship, plaintiffs failed to identify even a single client who declined to deal with them or made fewer trades because of Romany's calls. The tortious interference claims were properly dismissed.

V
Based upon our holding affirming the grant of summary judgment dismissing plaintiffs' claims under the LAD and for tortious interference, we need not address plaintiffs' arguments respecting the claims against Hayden and Romany individually and as aiders and abettors under N.J.S.A. 10:5-12(e), or plaintiffs' claim against PW for negligent retention of Romany.

VI
In their reply brief, plaintiffs contend that the $500 sanction imposed by the judge on their attorney personally must be reversed because it constituted an abuse of the judge's discretion.[4]
During the June 21, 2002 oral argument on defendants' summary judgment motion, the judge initially noted that plaintiffs' counsel ignored the requirements of R. 4:46-2(b) in failing to file a statement with the court responding to, admitting or denying each of defendants' statements of material facts filed pursuant to R. 4:46-2(a). The motion judge noted that the violation "was brought to [plaintiffs' counsel's] attention and nobody moved to correct it." Plaintiffs' counsel responded that her partner filed the responding papers, and she had no explanation for the firm's noncompliance with the rule. She apologized, stating that "[i]t was just an oversight."
The motion judge commented that she and her law clerk "had to spend hours and days" going through the record. "[I]nstead, what you forced the two of us to do is to struggle through everything because *961 you didn't do your job."[5] Consequently, the judge ordered sanctions against plaintiffs' counsel in the amount of $500 "for violation of a court rule [and for] delaying the Court's time in doing its work properly and interfering with other things."
The requirements of R. 4:46-2(a) and (b) for filing statements of material facts by parties to a motion for summary judgment are designed to "focus ... attention on the areas of actual dispute" and "facilitate the court's review" of the motion. Pressler, Current N.J. Court Rules, Comment R. 4:46-2. Indeed, we noted in Housel v. Theodoridis, 314 N.J.Super. 597, 604, 715 A.2d 1025 (App.Div.1998), that those requirements are "critical" and "entail[ ] a relatively undemanding burden."
Rule 1:2-4(b) states that for failure to comply with motion requirements, a court "may dismiss or grant the motion or application, continue the hearing to the next motion day or take such other action as it deems appropriate...." Moreover, "a range of sanctions is available to the trial court when a party violates a court rule." Abtrax Pharms., Inc. v. Elkins-Sinn, Inc., 139 N.J. 499, 513, 655 A.2d 1368 (1995) (quoting Zaccardi v. Becker, 88 N.J. 245, 252-53, 440 A.2d 1329 (1982)). Judges have "an inherent authority" to impose sanctions for blatant violations of our court rules apart from any specific provisions setting forth those sanctions. Summit Trust Co. v. Baxt, 333 N.J.Super. 439, 450, 755 A.2d 1214 (App.Div.), certif. denied, 165 N.J. 678, 762 A.2d 658 (2000). "Our standard of review of the imposition of sanctions requires us to abstain from interfering with those discretionary decisions unless an injustice has been done." Cavallaro v. Jamco Prop. Mgmt., 334 N.J.Super. 557, 571, 760 A.2d 353 (App.Div.2000).
Included in plaintiffs' nine-volume appendix is a document entitled "Statement of Material Facts Pursuant to Rule 4:46-2." It is stamped "filed" June 2002, leading us to believe that the document was filed with their response to the summary judgment motion and was intended to comply with R. 4:46-2(b). The document clearly does not comply with the rule, however. It appears to be an unsigned affidavit by one unnamed plaintiff and is not responsive to defendants' Statements of Material Facts.
Plaintiffs' counsel has given no reason for failing to comply with the court rule. Moreover, it appears from the record that plaintiffs' counsel was made aware of the violation prior to oral argument but still failed to file a compliant statement. In our view, the motion judge did not abuse her discretion by imposing a $500 sanction on plaintiffs' attorney. The sanction is affirmed.

VII
In defendants' cross-appeal, they argue that the motion judge erred in denying their application for counsel fees pursuant to the frivolous litigation statute, N.J.S.A. 2A:15-59.1, and the LAD's fee-shifting provision, N.J.S.A. 10:5-27.1. Defendants contend that they are entitled to fees because plaintiffs' claims were based on fabricated allegations that had no reasonable basis in fact or law. In denying defendants' application for counsel fees, the motion judge indicated that the test is whether the action was filed in bad faith. She concluded that although plaintiffs did *962 not present sufficient evidence to maintain their claims, they did not act in bad faith.
After oral argument before us, we were particularly dismayed by plaintiffs' persistence in pursuing their allegation that Hayden and Romany "engaged in a close, intimate personal relationship." When pressed for the factual basis for this claim, plaintiffs' counsel equivocated on whether "intimate" meant "sexual" and once again relied on nothing more than office gossip in insisting that "perceptions" are sufficient to pursue a claim for third-party sexual harassment.
Notwithstanding our concerns with plaintiffs' failure to present factual evidence to support their claims, we do not find that the motion judge abused her discretion in denying defendants' motion for counsel fees.
Affirmed.
NOTES
[1] The "facts" purportedly underlying plaintiffs' allegation of a "close, intimate personal relationship" between Hayden and Romany are that they had lunch together almost every day and met at the gym in the morning.
[2] At oral argument, plaintiffs' counsel indicated that the allegation of a "close, intimate personal relationship" did not necessarily mean Hayden and Romany were having a sexual affair. When questioned as to his use of the term "intimate," counsel gave a Clintonesque response that "intimate" did not necessarily mean "sexual."
[3] The term "flipping" refers to the practice of selling a bond to another broker, rather than a PW client, at a heavily discounted price. The broker in turn sells the bond to another broker, and the PW broker earns a commission on the deal.
[4] Although plaintiffs initially raised this issue in their reply brief filed on November 3, 2003, we granted their motion to consider this issue as if it had been raised in their merits brief.
[5] We can empathize with the trial judge. On appeal, plaintiffs have submitted nine volumes of appendices incorporating more than 1,100 pages, in addition to their seventy-nine page initial brief and their forty-page reply brief, albeit we granted plaintiffs' motion for leave to file an overlong brief.